## WALLING v. WEST KENTUCKY COAL CO.
### Civ. A. No. 612.

District Court, W. D. Tennessee, W. D.

Dec. 1, 1944.

George W. Jansen, of Washington, D. C., and Jeter S. Ray and Glen M. Elliott, both of Nashville, Tenn., for plaintiff.

James G. Wheeler, of Paducah, Ky., and Burch, Minor & McKay and C. O. Franklin, all of Memphis, Tenn., for defendant.

BOYD, District Judge.

This cause came on for trial before me at Memphis, Tennessee, on the 24th, 25th and 26th days of October, 1944. George W. Jansen of Washington, D. C., Jeter S. Ray and Glen M. Elliott of Nashville, Tennessee, appeared on behalf of the plaintiff; James G. Wheeler of Paducah, Kentucky, Lucius E. Burch, Jr., and C. O. Franklin, both of Memphis, Tennessee, appeared on behalf of the defendant.

Upon consideration of the pleadings filed herein, the testimony adduced at the trial, including documentary evidence, and the entire record in the case, and after hearing arguments of counsel, the Court makes and files the findings of fact, conclusions of law and order for judgment hereinafter set forth.

### Findings of Fact

I. Defendant is, and at all times since the effective date of the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., has been, a corporation organized under the laws of the State of New Jersey, having its home offices in Earling-

ton, Kentucky, domesticated and doing business in the State of Tennessee at Memphis.

II. Since the effective date of the Fair Labor Standards Act, defendant has owned and operated coal mines in the State of Kentucky producing approximately 15,000 tons of coal per day. It has owned and operated a railroad in Kentucky running from its mines to the Ohio River, used in transporting the coal produced by it. On the Ohio and Mississippi Rivers it owns a number of barges used in transporting its coal to various points upon these rivers, as well as loading, unloading and screening equipment at strategic points. The West Kentucky Coal Company of New Jersey has two wholly owned subsidiary corporations, the West Kentucky Coal Company of Delaware and the St. Bernard Coal Company. The parent and subsidiary corporations maintain branch offices and sales outlets through which coal, mined by the parent corporation, is sold and distributed in a number of states, including Kentucky, Tennessee, Arkansas, Louisiana, Mississippi, Wisconsin, Illinois, Missouri, Nebraska and Indiana. One of such branch establishments is located at Memphis, Tennessee, and with defendant's operations at the Memphis establishment this action is primarily concerned.

III. At Memphis defendant regularly employs thirty-five to forty persons in ordering, receiving, unloading, screening, selling, and distributing coal, in processes and occupations necessary thereto, in performing commercial tug boat services on the Mississippi River, and in the keeping and transmission of records covering all such operations. In carrying on its operations at Memphis, the defendant maintains an up-town office at 14 North Second Street, a barge fleet landing on the Arkansas side of the Mississippi River, a tug boat on the Mississippi River, Yard No. 1 located at the foot of Butler Avenue and physically connected with unloading equipment on the Tennessee side of the Mississippi River, and Yard No. 2 located on Heistan Street.

All coal distributed by defendant at Memphis is ordered and received from points outside Tennessee, and is received both by railroad and river barge. Defendant receives by rail substantially all coal delivered from Yard No. 2, while coal delivered from Yard No. 1 is received by barge to the extent that navigation and transportation facilities will permit. Rail shipments received at both Yards No. 1 and No. 2 are unloaded by defendant's employees at Memphis.

All coal received by barge, being in excess of ninety percent of the total volume delivered from Yard No. 1, is mined by the defendant at its mines in Western Kentucky, transported on its railroad to the Ohio River, loaded upon its barges and towed down the Ohio and Mississippi Rivers to Memphis, where the barges are received by defendant's tug boat and moored at defendant's fleet landing in Arkansas until needed. As coal is needed at Yard No. 1, defendant's tug boat tows the barges across the Mississippi to a steam shovel or digger, owned and operated by defendant, mounted upon a barge hull moored to the Tennessee bank of the Mississippi. Defendant's employees operate the steam shovel in unloading barges, placing the coal in a hopper which feeds it onto a conveyor. The conveyor, consisting of a series of endless belts, lifts the coal over Riverside Drive and carries it approximately 1500 feet to the top of an elevator located on Yard No. 1. This elevator consists of eight bins with a capacity of sixteen carloads, eight hundred tons, of coal. Four of the bins are equipped with power-driven machinery for screening the coal, the screenings thus obtained being designated and sold by defendant as pea and slack coal. Truck deliveries from Yard No. 1 are principally of screenings or pea and slack coal and the greater portion of such coal is obtained by the screening process.

Whereas the sale of screenings by defendant at Memphis comprises a large percentage of its total sales, it is established that screenings and the sale thereof constitute a minor, incidental and undesirable part of the sales of the retail coal dealer, as the term is generally understood. Domestic consumers do not generally purchase pea and slack coal, and sales of such coal to domestic consumers by defendant at Memphis comprise an inconsequential percentage of its business.

In addition to activities in connection with the sale and distribution of coal, defendant owns and operates at Memphis a tug boat on the Mississippi River, performing commercial tug service for boats and barge fleets moving in interstate commerce between all points on the Mississippi River.

Defendant is the only coal dealer in Memphis with equipment and facilities for

handling and unloading barge lot shipments, making sales on the river to boats, performing tug boat service, and an elevator with power driven machinery to perform the screening process.

IV. All defendant's operations and employees at Memphis are under the general supervision and control of a local manager stationed in the up-town office. Employees are transferred from job to job and from one site of operations to another, spending a substantial part of their time doing each kind of work during the same workweek, as occasion demands. For example, it is established both by defendant's time and payroll records, and the testimony of employees, that various employees during the same workweek have been transferred between two or more such jobs as laborer on the steam shovel, conveyor, elevator, unloading coal from freight cars at either Yard No. 1 or No. 2, acting as night watchman at the steam shovel or at the fleet landing in Arkansas, performing services on the tug, making truck deliveries from either or both yards, and maintaining and repairing the equipment used in unloading and screening coal at Yard No. 1. Records in connection with all operations at Memphis are cleared through the up-town office where a stenographic and bookkeeping force is employed.

V. Defendant's operations at Memphis since the effective date of the Fair Labor Standards Act have been carried on for the purpose of distributing its coal throughout the territory adjacent thereto, such territory consisting of portions of the States of Tennessee, Arkansas, Louisiana and Mississippi. Prior to approximately October 1942 a salesman, stationed in Memphis, traveled throughout this territory, but since that time sales outside the immediate vicinity of Memphis have been solicited largely by telephone and mail from the Memphis office. Sales of coal since the effective date of the Act have been in barge lots delivered on the Mississippi River, carload lots delivered as such in Memphis and throughout the territory above, as well as deliveries made directly from defendant's barges to boats on the Mississippi River, and by truck delivery in both interstate and intrastate commerce.

The employee at Memphis designated by defendant as its "wholesale salesman" is a part of defendant's Memphis staff. He has no separate telephone nor quarters, and utilizes all the facilities of the Memphis office. His correspondence is received, prepared and mailed by the clerical staff; all orders and contracts sold or negotiated by him are prepared in, clear through, and are filed in this office. In addition to his activities in connection with quantity sales, he solicits and receives domestic orders and performs various other duties, such as supervising employees at the yards, weighing coal and writing delivery tickets on truck deliveries.

VI. Sales and deliveries have regularly been made to individual and domestic consumers in small quantities at established prices, and to apartment houses, institutions, governmental agencies and commercial and industrial customers in quantities materially in excess of the quantities purchased by home consumers and at discounts from the regular price charged home consumers. A discount of 75 cents per ton under the domestic price is automatically given to an apartment of four or more units or to any person who purchases in quantities of or in excess of thirty tons, regardless of the type customer. Prices charged to commercial and industrial customers, institutions and governmental agencies are, in each case, determined by type of customer, quantity, frequency with which customer will accept delivery, duration of dealings between the seller and purchaser, prospect of re-order, type of delivery and competition.

VII. Defendant's sales to large commercial and industrial customers are made either by formal written contract or verbal commitment or understanding, under which the purchaser agrees, for a specified time, to purchase all his fuel requirements from the defendant, and the defendant agrees to satisfy the purchaser's fuel requirements for such time at a specified price. The purchaser's requirements for the entire term and the frequency with which it will accept delivery are estimated when the contract is executed or the commitment made. Negotiations with purchasers leading up to execution of formal contracts are carried on by defendant's local manager and "wholesale salesman." The contracts are typed by clerical personnel in the Memphis office. Prior to 1943 such contracts were formally executed on behalf of defendant either by the local manager or "wholesale salesman" alone affixing the company's signature, or by one such Memphis representative and a home office representative signing on behalf of the company. In 1943 and 1944 such contracts, after being ne-

gotiated and prepared in Memphis, and the purchaser's signature being obtained thereto, have been forwarded to the defendant's home office in Earlington, Kentucky, for execution by a home office representative, and returned to the Memphis office for filing.

Some of these formal written contracts, such as the current contract with the Perkins Oil Company covering the purchaser's estimated requirements of 10,800 tons per year for its Memphis plant, leave the method of delivery, i.e., whether in carload lots or by truck delivery, optional with the seller, whereas other such contracts, as in the case of the current contract with the American Snuff Company, specify delivery in carload lots. Under each type contract, however, the defendant makes deliveries both in carload lots and by truck at its option.

The oral commitments under which defendant, at Memphis, supplies large commercial and industrial customers, are negotiated entirely at Memphis by either defendant's local manager or its "wholesale salesman."

VIII. Sales to institutional and governmental purchasers, such as the various departments of the City of Memphis and the Federal Housing Authority, are made either by formal contract or commitment covering the purchasers' requirements for a specified time at a specified price. In either type sale the contract or commitment is entirely negotiated and solely executed on behalf of the company by personnel at defendant's Memphis office. Representative of such commitments is one renewed for a number of years, to furnish the Board of Education of the City of Memphis with its requirements for the period of one year, estimated at 5,000 tons, at a price substantially less than the domestic price, such commitment having been made by defendant's Memphis manager. Representative of such contracts is one with the City of Memphis, to supply the estimated fuel requirements of its miscellaneous departments for the period of one year, requirements estimated at 1,000 tons, such contract having been entirely negotiated and executed in Memphis each year for a number of years by defendant's local manager.

IX. Substantial quantities of coal are regularly sold at discounts under commitments executed by defendant's Memphis manager to boats and barge lines operating in interstate commerce on the Mississippi River. Such sales are made either by the tug boat captain or the foreman at the steam shovel, the coal being delivered directly from defendant's barges to the boats by defendant's employees. The delivery tickets and records on such sales are transferred through Yard No. 1 to the up-town office, entered upon defendant's records by its Memphis office employees who prepare invoices and statements thereon and receive and deposit remittances therefor. Such are sales and deliveries of goods in interstate commerce.

X. Sales to apartments and to purchasers of quantities in excess of thirty tons, at established discounts of seventy-five cents per ton less than the domestic price, are made both under commitments and in the regular course of business.

XI. Quantities of coal are regularly sold during the winter months to peddlers for resale. Such sales go through the records as cash transactions, and the exact quantity thus sold is not ascertainable. It is established, however, that peddlers have been so numerous as to interfere with traffic at defendant's yards to the extent that during periods the defendant has found it necessary to bar them therefrom.

XII. Where purchasers wish deliveries under contracts or commitments, either by truck or in carload lots, they contact any person in defendant's Memphis office. In all cases where delivery is by truck, whether under contract or commitment, and in some instances when delivery is in carload lots direct to the purchaser's siding, the records thereon are kept by defendant's employees in Memphis. Where such deliveries are by truck from No. 1 yard, the coal is received in defendant's barges, unloaded, screened and delivered by its employees. Its employees at Yard No. 1 weigh and write delivery tickets thereon, such tickets being transferred to defendant's up-town office, tabulated, and the charges therefor entered upon defendant's ledger. Statements and invoices covering such deliveries are sent from the Memphis office and remittance in payment therefor received at the Memphis office. In some instances carload shipments under such contracts or commitments are entered upon the records at Memphis, invoiced from and collected for at Memphis.

XIII. Large quantities of coal are regularly sold at substantial discounts from the domestic price to the United States Engineers at West Memphis, Arkansas, and

delivered in barge lots to various points on the Mississippi River. At least since January 1943, all such sales have been made by personnel in defendant's Memphis office, orders therefor being placed by telephone with either the local manager, bookkeeper or "wholesale salesman." Formal purchase orders are later received at Memphis, the accounts carried upon the Memphis accounts receivable ledger, invoices and statements rendered from Memphis, and collection therefor made at Memphis. Such sales constitute an integral and substantial part of defendant's Memphis operations.

XIV. Large quantities of coal are regularly sold and delivered in carload lots at substantial discounts from the domestic price to commercial, industrial, governmental and institutional purchasers throughout the area surrounding Memphis in the states of Tennessee, Arkansas, Louisiana and Mississippi. Some of such sales and deliveries are made as a result of single orders, while others are made pursuant to formal written contracts negotiated by personnel in defendant's Memphis office. A portion of these contracts have been signed on behalf of the defendant solely by the Memphis "wholesale salesman," others by the local Memphis manager, while others have had the signature of a home office representative attached. In either event, the negotiations with the purchaser resulting in the execution of such contracts have been carried on by defendant's Memphis employees, the contracts prepared in the Memphis office, and there filed after execution.

Both under such contracts and individual carload orders 100 to 285 carload sales and deliveries were made during each six months of the period in proof. In substantially each instance the purchaser made his request by mail or telephone to defendant's Memphis office. Mail orders were received and given to the Memphis "wholesale salesman" by clerical personnel, and telephone orders were received by the various type personnel in the Memphis office. Orders for carload deliveries were prepared in sales books located in the Memphis office, either by the local manager, clerical personnel or the "wholesale salesman" for his signature, the original thereof transmitted to the company's home office and a copy filed in Memphis. The defendant advertises to the public its willingness to accept such orders at Memphis and such sales constitute an integral part of defendant's Memphis operations.

XV. Defendant's sales during the period January 1, 1943 through June 30, 1944 were, upon the trial of the cause, considered by both parties as representative. Analysis of such sales discloses that the defendant sold from 35,000 to 44,000 tons of coal during each period of six months, receiving therefor approximately $164,000 to $202,000, and that during each such period it received approximately $6,800 to $7,800 from the operation of its tug boat on the river.

Sales and deliveries from Yard No. 2, substantially all of which were domestic sales, constituted only a small percentage of total sales, as, for example, during the period January 1 through June 30, 1944, they totaled in dollar value approximately seven percent of total sales and approximately ten percent of the combined truck delivery sales from both Yards No. 1 and No. 2.

Truck deliveries made from Yard No. 1 to as few as fifteen to eighteen commercial and industrial customers (exclusive of institutional, governmental and apartment customers) made pursuant to written contracts or verbal commitments at substantial discounts, during each six month period constituted more than fifty percent, both in tons and dollar value, of truck deliveries from Yard No. 1, as during the period January 1, 1943, through June 30, 1943, when the deliveries to this number of customers from Yard No. 1 constituted 68.9 percent in tons and fifty-nine percent in dollar value, of all truck deliveries from this yard. It was conceded by the defendant during the trial that a substantial percentage of the goods manufactured by each of these customers, designated in the summary of sales as commercial and industrial customers, was produced for interstate commerce and that the coal delivered to them by defendant was used in the production thereof.

Combining truck deliveries during this period to commercial and industrial, governmental, institutional and apartment customers, made from Yard No. 1 pursuant to contract or verbal commitment, their total constitutes 81.6 percent in tons and 75.4 percent in dollar value of all truck deliveries made from this yard.

In addition to defendant's receipts from such interstate transactions as the sale and delivery of coal to points outside Tennes-

see in carload and barge load lots, sales to boats moving in interstate commerce on the river, and tug boat services to such boats (the returns from all of which amount to approximately 25 percent to 40 percent of defendant's total receipts for respective six month periods), from its yards in Memphis the defendant regularly and customarily sells substantial quantities of coal for delivery to points outside Tennessee both in its trucks and trucks of its purchaser. Frequently such transactions go through the records as cash items and the total volume of such sales cannot be accurately determined. It is definitely established, however, that, as in the period July 1, 1943 through December 31, 1943, defendant received from such deliveries at Yard No. 1 alone the sum of $8,905.54, or 9 percent of its total receipts from truck deliveries at this yard.

XVI. At least since October 24, 1940, defendant has failed and refused to compensate employees in its Memphis office, working foreman of the steam shovel crew, maintenance man, and clerks, all of whom have been employed upon the basis of fixed monthly salaries, for hours worked in excess of forty per workweek at a rate not less than one and one-half times the regular rates at which they were employed. As to some such employees hourly rates and a number of hours as hours worked have been entered upon defendant's time and payroll records purporting to reflect the payment of overtime compensation. Such entries are inaccurate, and the system is a mere bookkeeping device employed by defendant to show payment of overtime compensation when such was not, in fact, being paid.

XVII. Since at least October 24, 1940 the defendant has failed and refused to compensate numerous persons employed upon the basis of hourly rates or rates per ton, engaged in interstate commerce or the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act, for hours worked by them in excess of forty per week at a rate not less than one and one-half times the regular rates at which they were employed, including persons employed by it in and about its operations at Memphis as watchmen, in the unloading of carloads of coal, maintenance and operation of the steam shovel, conveyor, elevator, and in making intrastate deliveries of coal to industrial consumers for use in the production of goods for commerce. Although in some instances the defendant has paid to some such employees one and one-half times their regular rate of pay for hours worked in excess of eight per day upon specified jobs, it has not paid such overtime compensation for hours over forty per week upon these jobs, and has frequently suffered and permitted employees, engaged in interstate commerce or the production of goods for interstate commerce, as above, to work upon different jobs hours aggregating more than ninety per week without the payment of any compensation other than the employees' regular hourly rate of pay.

XVIII. At no time since the effective date of the Fair Labor Standards Act has the defendant kept any record of the hours worked by persons employed by it in its office at Memphis, Tennessee, of the hours worked by persons engaged in delivering coal by truck from its yards in Memphis, nor an accurate record of the hours worked by persons employed by it as foreman of the steam shovel crew, watchmen, or scale clerks. As to some such employees merely a record of days worked per week has been kept, as to others punching time cards actual hours worked as reflected thereby have been ignored, and in both instances inaccurate entries of hours worked have been entered by defendant upon its time and payroll records. Such entries have been made at the direction of defendant's local manager. In no instance have defendant's records contained the home address of persons employed by it at Memphis.

XIX. Truck drivers employed by defendant frequently spend a substantial portion of their hours worked engaging in other activities. Two of such drivers made occasional deliveries across state lines. A major portion, frequently all, of the hours worked by drivers delivering coal from Yard No. 1 was spent in making intrastate deliveries to industrial customers engaged in the production of goods for commerce, such coal being necessary to such production.

XX. Representative of employees as to whom the Section 13(a) (1) exemption is claimed are the foreman of the steam shovel and the scale clerk. Ezra Stacey, foreman of the steam shovel, working under the direction of the local manager, receives a salary of less than $200 per month and his hours of work of the same nature as that performed by nonexempt

employees exceed twenty percent of the number of hours worked in the workweek by the nonexempt employees under his direction; R. G. Sutton, scale clerk at Yard No. 1, receives a salary of less than $200 per month, neither customarily nor regularly directs the work of any employee, and although spending less than one hour each day at Yard No. 2 performing activities incidental to retail sales, engages in making retail sales or performing work immediately incidental thereto for less than twenty percent of the number of hours worked each workweek by employees exempt by reason of their activities in making retail sales and performing work immediately incidental thereto. He regularly and customarily each workweek spends a substantial number of hours worked in preparing defendant's Memphis time and payroll records.

XXI. The words "retail" and "wholesale" have an established meaning in the coal trade which in substance has been adopted by several agencies of the United States Government. They define the terms as follows: "Retailing" is the selling or selling and delivering of solid fuel in other than railroad cars or cargo vessels without regard to quantity, price, or frequency of delivery. "Wholesaling" is the selling, or selling and delivering, of solid fuel in railroad cars or cargo vessels.

## Conclusions of Law

I. The Court has jurisdiction of the parties hereto and of the subject matter of this action.

II. The employees engaged in and about defendant's establishment at Memphis, Tennessee, in ordering, receiving, unloading, handling and otherwise participating in the receipt of coal from other states and in performing similar duties in connection with sales to customers in states other than Tennessee are engaged in commerce within the meaning of the Fair Labor Standards Act.

III. Defendant's employees engaged in the screening of coal and in other processing activities are engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act. Likewise, defendant's employees engaged in connection with the supplying of coal for use by defendant's customers in the production of goods for interstate commerce are themselves engaged in a process or occupation necessary to the production of goods for interstate commerce.

IV. Sales and deliveries to peddlers for resale, and to commercial and industrial customers, institutions, governmental agencies, including United States Engineers located at West Memphis, Arkansas, river sales, apartment sales, and sales at quantity discounts, in quantities substantially larger and at prices substantially less than prices charged and quantities delivered the domestic consumer are nonretail sales, as the term is generally understood, and an establishment making a substantial portion of its sales to such purchasers is not a retail establishment within the meaning of Section 13(a) (2) of the Fair Labor Standards Act.

V. An establishment engaged in processing the goods sold by it cannot be considered to be a "retail establishment" irrespective of the character of the sales of the establishment where such processing is not merely incidental to such retail sales as may be made.

VI. In determining coverage under the provisions of the Fair Labor Standards Act of 1938, the workweek is the standard, and an employee engaged in the performance of work covered under the Act and work of an exempt nature or noncovered work during the same workweek, must be compensated for all work during the week in accordance with the standards prescribed in the Act.

VII. Excessive hours are compensated for under the Fair Labor Standards Act of 1938 at a rate not less than one and one-half times the regular rate at which a person is employed.

VIII. Under the Fair Labor Standards Act of 1938 where employees work for a fixed weekly salary and a fluctuating number of hours each week, the regular rate of pay is determined by dividing the weekly salary by the actual hours worked.

IX. A truck driver for a nonretail concern who spends a major portion of his time during any workweek making intrastate deliveries of coal to commercial and industrial consumers engaged in the production of goods for commerce, such coal being necessary for such production, is not such an employee as would come within the scope of the exemption afforded

by Section 13(b) (1) of the Fair Labor Standards Act, and therefore is subject to the provisions of the Fair Labor Standards Act.

X. Generally speaking, a truck driver for a wholesale or nonretail concern who makes deliveries into states outside of Tennessee, and is engaged in interstate or foreign commerce within the meaning of the Motor Carriers Act, 49 U.S. C.A. § 301 et seq., is subject to the exemption of the Fair Labor Standards Act, Section 13(b) (1).

Where, however, such driver makes only an occasional trip into another state and the major portion of his time during the workweek is taken up with activities of his employer which have to do with the production of goods for commerce, he would not be subject to the exemption afforded by Section 13(b) (1).

XI. Under the facts of this case, it cannot be said that the defendant's employees in question are within the scope of Section 13(a) (1) of the Fair Labor Standards Act, which exempts employees employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman.

XII. Under the facts of this case, the defendant's employees on the tug boat performing commercial tug service for boats and barge fleets moving in interstate commerce are within the scope of Section 13(a) (3) of the Fair Labor Standards Act, and are exempt as seamen.

XIII. Under the facts of this case, watchmen are covered under the Fair Labor Standards Act and have not been compensated for overtime work in accordance therewith. Nor do the company records reflect the necessary data on these employees under the regulations pursuant to the Act.

XIV. A definition of the term "retail dealer" evolved and accepted by the coal industry and by certain governmental agencies, may be considered by the Court in determining whether or not a given business comes within the retail exemption 13(a) (2) of the Fair Labor Standards Act along with other considerations, but same is not controlling on the question of Congressional intent as to what constitutes a retail establishment under the terms of the Act. The exemptions afforded "retail establishments" under the Act must be applied uniformly to all engaged in commerce or the production of goods for commerce, and it is not for the different industries or others to devise and promulgate definitions which might exempt its members from the terms and provisions of the Act.

XV. By paying to certain of its employees who were engaged in commerce and in the production of goods for commerce compensation at rates less than one and one-half times the regular rate of pay for hours in excess of forty per week, defendant has violated Sections 7 and 15(a) (2) of the Fair Labor Standards Act.

XVI. The defendant has violated Sections 11(c) and 15(a) (5) of the Fair Labor Standards Act by its failure to make, keep and preserve records setting forth the information required by the duly promulgated regulations of the Administrator of the Wage and Hour Division.

XVII. Violations of the overtime and record keeping provisions of the Fair Labor Standards Act constitute cause for the granting of an injunction.

XVIII. Upon the whole record, plaintiff is entitled to the relief for which prayer in the complaint is made.

### Order for Judgment

It is ordered that the judgment be entered in accordance with the foregoing findings of fact and conclusions of law.