## WALLING v. CONSUMERS CO.

### No. 8567.

Circuit Court of Appeals, Seventh Circuit.

March 20, 1945.

Rehearing Denied May 23, 1945.

Douglass B. Maggs, Bessie Margolin, and Archibald Cox, Department of Labor, all of Washington, D. C., Kenneth P. Montgomery, Dept. of Labor, of Chicago, Ill., and Harry M. Leet, of Washington, D. C., for appellant.

Joseph B. Fleming and Edward C. Caldwell, both of Chicago, Ill., for appellee.

Before MAJOR and KERNER, Circuit Judges, and BRIGGLE, District Judge.

KERNER, Circuit Judge.

The Administrator of the Wage and Hour Division brought this complaint under § 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, to enjoin defendant from violating the Act's overtime provisions with respect to certain employees engaged in unloading coal and building materials. The case has been confined to employees engaged in unloading operations. The defendant denied coverage under the Act. After a trial on the merits, the trial court made findings of fact and conclusions of law, and held that the employees in-

volved were engaged in "interstate commerce" but were exempt from § 7(a) of the Act, 29 U.S.C.A. § 207(a), because they were engaged in "retail establishments," and dismissed the complaint. To reverse the decree, the Administrator appeals.

The questions calling for solution are whether the employees engaged in unloading merchandise coming from outside the State of Illinois are engaged in interstate commerce within the meaning of § 3(b) of the Act, 29 U.S.C.A. § 203(b), and whether defendant is a retail establishment within the meaning of § 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2).

The controlling facts are that defendant is engaged in Chicago, Illinois, in operating 14 coal yards and 10 building material yards, selling coal, building supplies, and other materials. By stipulation the case before us has been confined to employees at 3 of the coal yards and 8 of its building supply yards. The coal and building materials coming to these yards are purchased from mining companies, wholesalers, and manufacturers located in other states. These commodities are delivered by railroads at the yards on defendant's own switch track, where defendant takes possession and its employees unload the cars. In the coal yards defendant carries a supply of coal to take care of its trade for a period of 20 to 30 days, and at the materials yards it keeps sufficient material to meet any orders for a period of 15 to 30 days. No production for interstate commerce is involved and none of the coal or materials was sold to customers outside of the State of Illinois. Neither the coal nor the materials are purchased or ordered by defendant from mines, wholesalers or manufacturers on special orders or for specific customers or are ever marked or identified for any particular customer or for any particular order.

Defendant divided its sales of coal into three classes—domestic, commercial, and dealer sales. A domestic sale is a sale to a home or two-flat building; a commercial sale is a sale to an apartment building of three or more apartments, to stores, offices, churches, and factories. The greater portion of the sales are to commercial customers. A dealer sale is a sale to a person coming into the yards who purchases the coal in small quantities for the purpose of peddling it in his own truck. The dealers are known to the trade as peddlers; each has his own truck and he buys from a quarter of a ton to two or three tons. The average amount of coal sold at one time to the ordinary householder or two-flat owner is four or five tons, and the average commercial order is ten to fifteen tons. Defendant has classified the coal into two groups—domestic, a kind of coal that is especially prepared for a small type of equipment, and commercial, a finer size of coal that is more adapted to large equipment; if a full truck-load lot (four tons of coal or three tons of coke) is purchased, the price charged depends upon the type of coal purchased and not upon the amount purchased, but if less than a truckload lot is bought, the price is higher for the smaller quantity—one, two, or three tons, half ton, or quarter ton—than its proportion of the four ton price would be. In other words, the smaller the quantity bought, the higher the price. Defendant also makes some sales on bids to the City of Chicago or to the Board of Education.

In Yard 111 defendant unloads coal consigned to the Illinois Maintenance Company, stores it for that company, and delivers some of the coal to various buildings in the City of Chicago. Over a period of six months the coal thus handled was 12,000 tons.

Regarding the building materials, the record discloses that some of the materials are sold to individual purchasers buying for their own use, but most of the sales— 63% on the average—are in large lots to contractors who use the materials in the construction of buildings, streets, and roads. But the price structure differs from that in the coal yards. These yards have a list of selling prices, but the market is so competitive that practically all sales are individually negotiated with the purchaser. There are several factors upon the basis of which prices of building materials are determined, but the prices have no relation to the quantity sold. The most important factor is competition; the second is the proximity of the defendant's place of business to the place where the materials are to be delivered; and the third is the credit standing of the purchaser.

■ Since defendant may urge any ground in support of the decree, Helvering v. Lerner Stores Corp., 314 U.S. 463, 466, 62 S.Ct. 341, 86 L.Ed. 482, it contends that the employees engaged in unloading the coal and building materials were not within the coverage of the Act. The argument is that after the goods arrived at the yards

they had "reached their final resting place," the interstate character of the shipments ceased, and the subsequent unloading was an intrastate activity. On the other hand, plaintiff contends that regardless of whose property they are on, the goods move in commerce until they are unloaded in the yards.

■ In support of its contention defendant relies upon Higgins v. Carr Bros. Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468. See also the same case in 138 Me. 264, 25 A.2d 214. In that case it is true that defendant bought its merchandise from dealers in other states, which was delivered by truck and rail, unloaded into its warehouse, and from there distributed to the retail trade. The court held that Higgins was not covered by the Act, but that was so because Higgins was not engaged in the unloading of the merchandise from the trucks and rails. His duties were to load trucks with merchandise obtained from the warehouse and deliver it to the local trade. In addition to the Higgins case, defendant cites the cases noted below.[1] Those cases do not involve the Fair Labor Standards Act. They are rate cases, actions under the Federal Employer's Liability Act, 45 U.S.C.A. § 51 et seq., and one is a criminal case. They do not constitute a complete guide in the case before us, since decisions dealing with various assertions of federal power in the commerce field are not particularly helpful in determining the reach of this Act. Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 521, 62 S.Ct. 1116, 86 L.Ed. 1638. Defendant, however, also cites cases under the Act,[2] supporting its contention, but we believe that the preferable view is found in the cases presently cited.

■ The right to the title or custody of the merchandise in an interstate shipment is not determinative of the question where interstate commerce ends, East Ohio Gas Co. v. Tax Commission, 283 U.S. 465, 470, 51 S.Ct. 499, 75 L.Ed. 1171; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 605, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014. Neither the switch track nor the cars in which goods are carried are a place of rest or final destination, Stafford v. Wallace, 258 U.S. 495, 515, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; consequently, the coal and materials have not reached their destination until actually unloaded and deposited in the yards. Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778. We have been told that in using the phrase "engaged in commerce" Congress meant to extend the benefits of the Act to employees "throughout the farthest reaches of the channels of interstate commerce," and when goods once enter the channels of interstate commerce, they thereby acquire an interstate status which continues until the interstate journey ends. Walling v. Jacksonville Paper Co., 317 U.S. 564, 567, 568, 63 S.Ct. 332, 335, 87 L.Ed. 460. To be engaged in commerce within the meaning of that phrase, an employee must be actually engaged in the movement of commerce, or the services he performs must be so closely related thereto as to be for all practical purposes an essential part thereof. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538. And in that connection closeness depends upon the essentiality and indispensability of the particular work or services performed to the actual movement of commerce. Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656. Unloading of an interstate shipment is so closely related to interstate transportation as to be an integral or component part of the interstate journey, Baltimore & Ohio S. W. R. Co. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68

1 Chicago, Milwaukee & St. Paul R. Co. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988; Chicago, Burlington & Quincy R. Co. v. Harrington, 241 U.S. 177, 36 S.Ct. 517, 60 L.Ed. 941; Lehigh Valley R. Co. v. Barlow, 244 U.S. 183, 37 S. Ct. 515, 61 L.Ed. 1070; Delaware, L. & W. R. Co. v. Peck, 2 Cir., 255 F. 261; O'Kelley v. United States, 8 Cir., 116 F. 2d 966; Gulf, Colorado & Santa Fe Ry. Co. v. Texas, 204 U.S. 403, 27 S.Ct. 360, 51 L.Ed. 540; Baltimore & Ohio S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; and Southern Pacific Co. v. Van Hoosear, 9 Cir., 72 F.2d 903.

2 Campanale v. General Ice Cream Corp. 314 Mass. 387, 49 N.E.2d 1018, 1019; Henderson et al. v. Memphis Compress & Storage Co.,* Tenn.; Gerdert et al. v. Certified Poultry & Egg Co., Inc., D.C., 38 F. Supp. 964, 973; Delcour v. Lehigh Valley Coal Sales Co., 182 Misc. 289, 43 N.Y.S.2d 371; Rauhoff et al. v. Henry Gramling & Co., D.C., 42 F.Supp. 754, 756; Veazey Drug Co. v. Fleming, D.C., 42 F.Supp. 689, 694; Wagner v. United Dividend Corp., Colo.D.C., Las Animas County, 5 Labor Cases, par. 60,889; Isbell v. V. M. Wood & Co., et al., Alabama Intermediate Civil Court of Birmingham, 4 Labor Cases, par. 60723.

* No opinion for publication.

L.Ed. 433, and the unloading at destination of an interstate shipment is work in interstate transportation, whether done by the carrier or another. Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 398; Allesandro v. C. F. Smith Co., 6 Cir., 136 F.2d 75, 149 A.L.R. 382; James V. Reuter, Inc., v. Walling, 5 Cir., 137 F.2d 315; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 335; and Clyde v. Broderick, 10 Cir., 144 F.2d 348.

Applying the tests enunciated in the cases cited, we are of the opinion that the removal of the coal and materials from the railroad cars used in the interstate shipments was essential to the movement of commerce, and that the employees unloading the cars were actually engaged in the movement of commerce.

We now come to the question whether defendant falls within the exemption of § 13(a) (2), 29 U.S.C.A. § 213(a) (2), exempting employees engaged in any "retail establishment," the greater part of whose selling is in intrastate commerce.

In support of the decree defendant makes the point that the Solid Fuels Administrator for War[3] has defined a retail dealer of coal as any person who sells and delivers coal in less than carload lots; that under the terms of the Bituminous Coal Code,[4] a wholesaler of coal is one who sells coal in carload lots or more than carload lots, and that in the coal trade the words "retail dealer" have a definite accepted meaning: the selling and delivering of coal in other than carload lots. A carload lot means a railroad car lot, not a truck-load lot, and the former is very much larger than the latter.

In our opinion the definition of the term "retail dealer" on which defendant relies is not controlling on the question of Congressional intent as to what constitutes a retail establishment under the terms of the Act, Walling v. West Kentucky Coal Co., D.C., 60 F.Supp. 681, nor do we believe that the trade meaning of retail dealer and the definitions of a retail coal dealer made by the Solid Fuels Administrator for War and as contained in the Bituminous Coal Code are applicable here. What concerns us is not the definition of the words at other times and in other contexts; rather, our task is to examine the purposes of the Act in order to ascertain the object and therefore the scope of the § 13(a) (2) exemption, and in doing so we must read the Act in the light of the mischief to be corrected and the end to be attained.

The Fair Labor Standards Act was designed to include within its scope and coverage every employee "engaged in commerce," except those specifically exempted therefrom, and, since the Act is in its nature remedial, it should be liberally construed so as to effectuate its humanitarian purposes; its exemptions, however, must be strictly and narrowly construed, Joseph v. Ray, 10 Cir., 139 F.2d 409, and Schmidtke v. Conesa, 1 Cir., 141 F.2d 634. By the Act, Congress intended to establish a uniform national policy applicable to all industries, Tennessee Coal, Iron & R. Co. v. Muscoda Local, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949. To achieve that purpose the word "retail" must be given a uniform meaning in all industries. It is true, the Act does not define "retail establishment" but it is phrased in ordinary, nontechnical language for general application; and when Congress gives no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense, the words must be given their plain, ordinary and commonly understood meaning. Addison v. Holly Hill Fruit Products Co., 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 1488. Giving this force to the words of the statute, it is fair to assume that by "retail establishment" was meant a business making retail sales. We know that retail sales are sales in individual quantities for personal or household consumption, Webster's New International Dictionary, Unabridged (2d Ed. 1942), 13 Encyclopedia of Social Sciences, 346, 15 id. 411; Bracey v. Luray, 4 Cir., 138 F.2d 8, 10, and that a retail establishment sells what are usually and regularly regarded as consumers goods.

There can be no question but what there is a clear distinction between retail merchants selling in small quantities to customers purchasing goods to satisfy

3 Title 30, Mineral Resources, c. VI, Solid Fuels Administration for War, Regulation 7, Part 602, General Orders and Directives, Fed.Reg. of Nov. 4, 1943, Vol. 8, No. 219, page 15176.

4 Chapter 127, § 4, Part II, 50 Stat. 77, 81.

their individual needs and enterprises which sell their goods in large lots to industrial and commercial users purchasing for a business motive. Congress intended to exempt employees in the former. To come within the exemption the employee must be engaged in a "retail establishment" as that phrase is understood by the common run of men and as it has been "construed in the light of its Congressional history," cf. New Mexico Public Service Co. v. Engel, 10 Cir., 145 F.2d 636, 641. Congress regarded as falling within "retail establishment," merchants selling to consumers to satisfy their individual needs, such as local grocerymen, druggists, clothing stores, meat dealers, and the like, Guess v. Montague, 4 Cir., 140 F.2d 500, and Walling v. American Stores Co., 3 Cir., 133 F. 2d 840. And the courts have said that a retail sale means a sale in small quantities to the ultimate consumer, Bracey v. Luray, supra; Walling v. Roland Electrical Co., 4 Cir., 146 F.2d 745; cf. Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572, affirmed Arsenal Bldg. Corp. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Fleming v. Arsenal Building Corp., 2 Cir., 125 F.2d 278, 280, and that a retail sale means a sale in small quantity or direct to the consumer, White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92. Here, defendant's commercial customers bought coal in large quantities which was not suitable for individual use in homes because it was of a size and kind which could be burned only by users who had large furnaces with extensive grate areas, stokers, spray feeders, or other special equipment. The sales to coal dealers, which in two out of the three coal yards accounted for more than one-fourth of the total tonnage sold, were not sales to the ultimate consumer; they were sales for re-sale.

At Yards 48, 111, and 136, 46%, 73%, and 70%, respectively, of the coal was sold to commercial customers who bought quantities materially in excess of the quantity purchased by home consumers. All the sales were in less than carload lots, but at least 75% of the sales at each of the yards were to buyers actuated by a business or profit motive rather than to consumers buying to satisfy their own or their household's individual needs. We have already observed that 63% of the building materials were sold to contractors who passed the cost of the materials on to the ultimate consumers.

On the facts of this case we are of the opinion that defendant's business is not a retail establishment within the meaning of the Act; consequently, the decree must be vacated and the case remanded for further proceedings not inconsistent with this opinion. It is so ordered.

BRIGGLE, District Judge (dissenting).

Two questions are present in this case: (1) Was defendant engaged in interstate commerce? (2) Was defendant conducting a retail or service establishment? The District Court answered both questions in the affirmative. If he was right in both answers the judgment must be affirmed. If he was wrong in both answers the judgment must be affirmed. If he was wrong in the first answer and right or wrong in the second the judgment must be affirmed. Only if he was right in the first answer and wrong in the second can the judgment be reversed. The decisions leave the answer to neither question free from doubt, but my judgment is that the better view calls for a negative answer to the first question and an affirmative answer to the second. If I am right in either instance, the judgment should be affirmed.