**SKIDMORE et al. v. JOHN J. CASALE, Inc.**

**MOONEY et al. v. SAME.**

District Court, S. D. New York.
April 29, 1946.

Harold R. Korey, of New York City (Emanuel Tacker, of New York City, of counsel), for plaintiffs.

Charles E. Cotterill, of New York City (Charles E. Cotterill and Irwin D. Davidson, both of New York City, of counsel), for defendant.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D. C., and Irving Rozen, Regional Atty., and Philip A. Kleinberger, Asst. Atty., both of New York City, all of United States Department of Labor, for L. Metcalfe Walling, Administrator of the Wage and Hour Division, United States Department of Labor, as amicus curiae.

CONGER, District Judge.

These are actions brought under the Fair Labor Standards Act of 1938, 29 U.S. C.A. § 201 et seq., to recover unpaid overtime wages, liquidated damages, and attorneys' fees as provided by the Act.

The suits were tried together without a jury.

The plaintiffs are or were employees of the defendant Casale, performing their duties at the several garages of the defendant, located in Manhattan, Brooklyn and Long Island City, and they may be catagorized as maintenance men, mechanics, and mechanics' helpers, with the exception of two, one of whom was a porter and the other a chauffeur.

The defendant John J. Casale, Inc., is engaged in leasing trucks for haulage to business concerns in and about the City of New York, charging certain rentals for such service which include the cost of maintaining the trucks and the cost of operation. It provides no services in addition to the use and maintenance of the vehicles except on occasions when it fur-

nishes a driver. In general, the trucks are driven by employees of the defendant's customers and are in the complete control and custody of such lessees, when in use.

The plaintiffs, with the exception of the porter and chauffeur, performed various duties in connection with the upkeep and repair of the vehicles at the seven garages of the defendant.

The maintenance men were chiefly concerned with washing, greasing and refueling them, checking and changing tires, moving them about the garage, and from one garage to another, delivering parts for repairs, and similar tasks. The mechanics in the several garages did nightly what is termed "running repairs," such as tuning up engines, adjusting steering mechanisms, and other such repairs requiring a short period of time. At the 21st Street garage of the defendant, day mechanics did major repairs upon the trucks, periodically overhauling them and doing work of such a serious nature that it was impracticable of accomplishment for the night mechanics doing the "running repairs." These mechanics, in addition to doing overhauling and major repair work, were sent out to do emergency repair work on trucks ousitde the garage, sometimes travelling to New Jersey and Connecticut for this purpose. The mechanics' helpers were charged with assisting the mechanics plus other duties of repairing and checking.

There is nothing to show any division of labor on cars used in interstate commerce and on those used solely intrastate. Neither is there any testimony as to how much time each man spent on the cars used in interstate commerce. Defendant's books apparently were not so kept. No such proof was offered for it is of no significance unless it indicates segregation of workers. See Wage and Hour Interpretive Bulletin, No. 5; Walling v. West Kentucky Coal Co., D.C., 60 F.Supp. 681.

Suffice to say that the work on these trucks was not sporadic. It was constant and steady. Some of the work was done each night and the rest regularly and recurrently.

The Casale customers may be classified generally as manufacturers and processors, wholesalers and distributors, sales agencies and the like. The defendant's trucks are used by these concerns in the distribution of their products, and the record is replete with evidence of haulage to retailers, docks and railway terminals in and about the metropolitan New York.

The main question, then, is whether the plaintiffs are "engaged in commerce or in the production of goods for commerce" so as to entitle them to recovery under the Act.

Section 3(b) defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." 29 U.S.C.A. § 203(b).

Section 3(j) defines "produced" as "produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." 29 U.S.C.A. § 203(j).

Before the trial a stipulation (Ex. 2) was entered into and signed by the attorneys for the parties. This stipulation had to do with the use made of defendant's trucks which were garaged at the West 21st Street group of garages and at the East 93rd Street garage group. During the trial this stipulation was extended to cover the 49th Street Brooklyn garage.

Among other things it was stipulated that of the trucks owned by the defendant and so leased by it to its lessees, between 15 and 25 per cent of their use by the lessees in terms of mileage consisted during the period between October 24, 1938, and December 31, 1943, both inclusive, of haulage by the lessees of previously manufactured commodities in interstate or foreign commerce.

Defendant now asks to be relieved of this stipulation.

In addition there is this paragraph in the stipulation:

"7. Nothing contained herein shall operate to prevent either party from offering

further and additional proof with respect to the allegations of the complaint or the answer, or with respect to proof concerning the use of the trucks of any lessee of the defendant, or of the business of the defendant."

This paragraph is rather ambiguous but under all the circumstances I feel the stipulation should stand.

■ The stipulation itself is not evidence but is conclusive of the facts admitted and binding on the parties unless modified or relieved in the discretion of the Court. Richardson, on Evidence, 6th Ed., § 359.

■ Counsel may repudiate a stipulation if sufficient notice has been given. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 444, 22 S.Ct. 698, 46 L.Ed. 968.

■ I see no reason either to modify or relieve the parties of the stipulation.

It may very well be that plaintiffs relied on this stipulation and by reason thereof did not produce more evidence of the interstate business of the customers of Casale and the use therein of Casale's trucks.

I am confirmed in this by something which occurred after the case had been three-fourths tried and before plaintiffs had rested. One of the attorneys for the plaintiffs stated in open court that Paragraph 3 of the stipulation had been amended by inserting on a certain line therein the word "substantial". Then followed this remark by one of the attorneys for the defendant:

"Mr. Davidson: Now in return for the defendant agreeing to insert that one word 'substantial' in there, the attorneys for the plaintiffs here have agreed to call no more Casale lessees and to adduce no further testimony concerning the activities of the Casale lessees."

Therefore, I accept this stipulation as evidence of the substantial use of the defendant's trucks housed at those garages in the interstate business of its lessees.

The situation at the other four garages is different.

[5] No evidence was offered concerning the activities of the trucks housed at the 107th Street garage of the defendant and I cannot assume a course of conduct similar to the activities of the trucks at the other garages. It follows then that the status of any plaintiffs working there for any period of time can in no event be determined by me as being within the Act.

At the other three garages, the 27th Street garage, the Brooklyn (Taylor Avenue) garage, and the Long Island City garage, the evidence adduced indicates that the overall interstate use of the defendant's trucks was substantial, with frequent and regular trips to New Jersey and Connecticut, to railroad sidings and to the Pullman Company being shown.

■■ It is said that the evidence does not establish that the interstate use of Casale trucks was as much as 20% in the aggregate. That may be so; but I find nothing in the Act suggesting any percentage as a prerequisite to its operation in this situation. Those cases which applied the Wage and Hour Division standard for determining whether a substantial portion of a building is devoted to production for interstate commerce are inapplicable. In my interpretation a substantial use of the instrumentality in interstate commerce satisfies the requirements of Section 3(b). Schmidt v. Peoples Telephone Union, 8 Cir. 138 F.2d 13; New Mexico Public Service Co. v. Engel, 10 Cir. 145 F.2d 636. No question of "de minimis non curate lex" arises in view of the volume of business shown. New Mexico Public Service Co. v. Engel, supra; and compare Mabee v. White Plains Pub. Co., 66 S.Ct. 511, which appears to have excluded the application of that maxim in any circumstance under the Act.

On this point it should be noted that in 1941 the secretary and treasurer of defendant made an investigation among defendant's customers and came to the conclusion that the amount of interstate use of its trucks was approximately 23 per cent.

It is obvious that the work of these employees was essential to the operation of defendant's business and to the movement of its customers' commodities. It was said on this very point in Walling v. John J. Casale, Inc., D.C., 51 F.Supp. 520, at page 526, that:

"The tie between defendant's employees and its and the interstate business of its lessees seems, therefore, to be not only 'close and immediate, but definitely intimate.' In other words, the daily labors of defendant's garage employees are indispensable to the performance of the day by day business of defendant's lessees."

■■■ The test of whether employees come within the meaning of 3(b), of course, has no applicability to the business of the employer and whether or not he is engaged in interstate commerce. "The test under this present act, to determine whether an employee is engaged in commerce, is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it. * * * It is the work of the employee which is decisive." McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538. The rule as set forth in the Threlkeld case governs the right of the plaintiffs to recover here.

The rule applicable here is briefly, succinctly and equivocally stated. In all of these cases the yardstick of the law which shall govern is now fairly well established but the applicability to each individual case always presents a problem. The Court recognized this in Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638, when it said:

"To search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle. The judicial task in marking out the extent to which Congress has exercised its constitutional power over commerce is not that of devising an abstract formula."

This is a rather novel case. It is one which is difficult of solution. My study of the cases has convinced me that the Courts in the past few years have broadened the scope of the coverage of the Act to an extent beyond which was thought possible at or about the time when the Act went into effect.

I am satisfied, however, that the activity of these plaintiffs, or at least of some of them, is such that "they are actually in or so closely related to the movement of the commerce as to be a part of it."

I can come to no other conclusion when I read Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, and Pedersen v. J. F. Fitzgerald Construction Co., 318 U.S. 740, 63 S.Ct. 558, 87 L.Ed. 1119.

I confess I cannot see any difference in so far as it affects connection with interstate commerce between the plaintiff in the Overstreet case, who was engaged in the maintenance and repair work on the road and the bridge, and these plaintiffs who were working on the maintenance of these vehicles of defendant, nor can I see any difference between the plaintiff in the Pedersen case engaged in repairing a culvert along the line of the New York Central Railroad and these plaintiffs.

All were working on instrumentalities of commerce. If the men engaged in maintaining and repairing the toll bridge and the culverts may be considered as "engaged in commerce" I see no reason why the men engaged in maintaining and repairing these vehicles engaged in interstate commerce should not be so considered.

In the Overstreet case [318 U.S. 125, 63 S.Ct. 498] the defendant urged the same distinction we find defendant urging here—"that it is not engaged in commerce, but only in providing facilities which those carrying on commerce may use."

It is interesting to note that in the Pedersen case, supra, the employer was not itself engaged in interstate commerce but was an independent general contractor.

■■■ From the foregoing, I conclude that the activities of these maintenance men, mechanics, and mechanics' helpers were a necessary contribution to the substantial interstate business of defendant's customers in that they maintained instrumentalities of interstate commerce, and they are covered by the Act. Overstreet v. North Shore Corp. supra; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Pedersen v. J. F. Fitzgerald Construction Co., supra.

The status of the porter and the chauffeur is a further question.

The evidence shows that the porter's work consisted of taking care of washrooms, lockers, running errands and doing other similar tasks about the garage.

The chauffeur was employed as driver of the Chairman of the Board of Directors of the Castle Company. Seemingly, this was his only connection with the company. He had no time card and evidently reported to the garage only for the purpose of taking or returning the car.

■ In my conception of § 3(b), neither the porter nor the chauffeur were engaged in commerce. Their duties only remotely affected commerce and cannot be viewed as passing the test of McLeod v. Threlkeld, supra.

In order to find coverage for these two employees it would be necessary to bring them within the purview of § 3(j), but such a feat seems impossible. They "produced" no goods, nor were they engaged in any occupation necessary to the production thereof.

If it be conceded that the Casale customers were substantially in the business of producing goods for commerce, still the porter and the chauffeur were so far removed from such activity that coverage is impossible.

In accordance with the above I hold that plaintiffs Olton and Johnson are not entitled to recover here; that the remainder of the plaintiffs who worked at the West 21st Street group of garages, the East 93rd Street garage, the 49th Street, Brooklyn garage, the 27th Street garage, the Brooklyn garage at Taylor Avenue are entitled to recover herein.

I am unable to fix the amount from the present record. There is an exhibit in the case, put in by plaintiffs which shows the hours of work of plaintiffs and other items necessary in arriving at the amount due each plaintiff. When this was offered in evidence, I understood it was subject to check by the defendant. All of the figures have to come from defendant's books. At the trial I understood that the figures could be arrived at amicably. This should be done. If there is any difficulty I will take further testimony on the question, although that should not be required. I have not fixed counsel fee. That may wait until the amount of recovery for plaintiffs is ascertained.

Defendant has filed with me a brief in support of the proposition that it is not a carrier. I am a bit to blame for this. During the trial defendant insisted that one of the material things to ascertain first, was whether it (defendant) was an interstate carrier. I agreed, and certain testimony was offered on the part of the defendant on that issue. Mature deliberation convinces me that I was in error. No harm was done to plaintiffs' case, however. It in no way affected it.

Defendant does not claim it is a carrier in interstate commerce (either common or contract) within the definition of the Interstate Commerce Act, U.S.C.A. Title 49, § 303(a) (14) (15). If it did so claim and did so prove, then the plaintiffs would be subject to the provisions of such Act and in that case the provisions of the Fair Labor Standards Act would not apply to those plaintiffs whose work affected "safety of operation" of the vehicles used in interstate commerce. But defendant makes no such claim. It claims it is not such a carrier. Plaintiffs assent to it. So there is no issue, as far as this case is concerned, as to whether or not defendant is an interstate carrier and subject to the control of the Interstate Commerce Commission.

■ Were I to pass on this question, my decision would be on a matter in no way within the boundaries of this case. True, there is a dispute between Division 5 of the Interstate Commerce Commission and this defendant. Division 5 in a report dated November 5, 1944, declared that defendant was not a carrier for hire except in those particular instances, in which under separate agreement with customers it furnished drivers. Defendant, as indicated by its brief, vigorously disagrees with this finding. I can conceive of no reason why this court in the solution of the problem presented in this case should take part in this dispute.

In deciding this case I am assuming that defendant was not a carrier, subject to regulation by the Interstate Commerce Commission, and that the plaintiffs are

not exempt from the operation of the Fair Labor Standards Act. See Boutell et al. v. Walling, 66 S.Ct. 631, which rules on the point involved.

 Finally, I find no authority for the argument that the collective bargaining agreements under which the plaintiffs received wage increases should be considered in mitigation of damages. Congressional policy may not be thwarted by collateral agreements designed to give an employee something less than the full benefits of the Act. See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014.

Settle judgment in accordance herewith.