FLEMING, Adm'r of Wage and Hour Division, Dept. of Labor, v. STILLMAN et al.
RICHARDSON v. SAME.
STEWART v. SAME.

Civil Actions Nos. 101, 146, 147.

District Court, M. D. Tennessee,
Nashville Division.

Jan. 8, 1943.

610

See also, D.C., 37 F.Supp. 236.

Jeter S. Ray and James H. Hynes, both of Nashville, Tenn. for plaintiff.

Cecil Sims and Elkin Garfinkle, both of Nashville, Tenn. for defendants.

DAVIES, District Judge.

In the case of Fleming, Administrator, v. Stillman et al., the defendants, Julius Stillman and Dave Stillman, partners operating and doing business under the trade name and style of Auto Parts Company, have been engaged in business in Davidson County for several years; their business consists of buying wrecked and junked automobiles and stripping them of their serviceable parts. Some parts, when they are in serviceable condition, are simply washed and cleaned, and offered for sale, and others are repaired and offered for sale. Although in the beginning, what might be referred to as the carcasses of the automobiles, or what remained after the cars were stripped of their usable parts, were not of any great value and were discarded by the defendants by being hauled from their yards and deposited on the City dumps, yet in latter years, on account of certain world situations which now exist, the scrap in those carcasses became very valuable, and the defendants, since 1937 up to the present time, have been salvaging practically all of the skeletons of the cars, and they maintain a large yard at their plant that is used for the sole purpose of taking the available parts and accessories from the junked cars and after all accessories that are of any value

have been removed, the frames and bodies of the wrecked cars are cut into predetermined lengths and sold for scrap steel and scrap iron.

Now, as I recall from the evidence, the defendants' business originally was established for the sale of used parts, but later the defendants began to purchase new parts at wholesale for resale in the local territory. They have been engaged in that business for some time and beginning with the year 1938, down to date, it seems to be generally taken for granted from the record that as far as the parts business is concerned, both old and new, about thirty per cent of this business relates to the retailing of parts to small consumers; about thirty-five per cent relates to the sale of parts to large consumers, such as trucking lines and bus lines, and other large consumers; and about thirty-five per cent of their business relates to the sale of parts to service men, garages and others for the purpose of resale. The parts business, during the years 1938 and 1939, constituted a very large portion of the business done by the defendants. I find that the parts business amounted to approximately ninety per cent, possibly a little more, of their entire business.

The defendants, in the first instance, say that they are not subject to the terms and provisions of the Wage and Hour Act, Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., for the reason that they operate a retail or service establishment, and the greater part of their selling or servicing is in intrastate commerce, and they are entitled, therefore, to the exemption provided by Section 13(a)(2) of the Act, and that their employees are engaged in a retail or servicing establishment, and I think it proper to dispose of this question first.

In this connection the Court finds that, taking the defendants' own testimony, or their later testimony I might say, which I discuss further on, without any question thirty-five per cent of the defendants' business in parts relates to the sale of parts for resale; that is, sale to dealers who expect to resell them and make a profit on them, either by selling the parts themselves or by installing them on automobiles and charging for the parts and the service. Clearly that thirty-five per cent of the defendants' business is wholesale business. Now, as to the other thirty-five per cent that relates to the selling of parts to large users—and in this connection I think that we have to take into consideration all the facts and circumstances relating to the defendants' business. The defendant has two separate and distinct branches or places of business. These different establishments are located within a mile or so of each other, and one establishment, which is not in question in this case at all, is devoted entirely to retail sales to the general public, while, on the other hand, the particular branch of the business that is in question in this lawsuit has for some time been engaged in sales of a different nature. It is admitted that the wholesale business is handled from this particular branch or location.

When the question was made relative to defendants' obligations under the Wage and Hour Law, and whether or not they were required to comply with the terms and provisions of the Act, the defendants made an estimate themselves of the nature of their business, and their own estimate at that time was that seventy per cent of the business was wholesale and thirty per cent of the business was retail. At that time I assume they were not advised as to the technical legal definition of the term "wholesale business", and that they honestly thought that seventy per cent of their business was wholesale. They then regarded it as such, but upon being advised by their counsel as to the legal distinctions between wholesale and retail business, they changed their previous estimate so as to provide that, of the original seventy per cent which they considered wholesale, fifty per cent of that amount is actually retail in nature, for the reason that it is sold to large consumers and in large quantities ordinarily. However, the facts show that even when those regarded as large customers or large consumers purchase small articles, or a small amount of articles, they are able to purchase at the same price had they purchased a large quantity of the articles.

In addition, Mr. Solomon has testified that ninety per cent of defendants' business in this particular branch with which we are now concerned is business with dealers. That, of course, was his idea or estimate derived from experience he had in the salesroom of the company, and I assume that in making his estimate and his definition of "dealers" that he in all probability has classified large users or large consumers of these parts as dealers without

considering the strict technical definition of wholesale or retail business.

The defendants maintained three separate price lists for the same articles. When they would sell one of these particular articles to a retailer or a person who would in all probability be expected to sell it again, they charged one price. When they sold it to a person who was not a dealer in any way but who would in all probability be expected to use the goods, they charged another and different price, and when they sold the same article to one of their customers who was a large consumer, they charged still another and lower price. Now gentlemen, that is not the usual manner in which a retail business is conducted, and that was their fixed policy in the sale of parts. Furthermore, they at one time since the Wage and Hour Law went into effect, ordered two carloads of alcohol to be sold on a consignment basis. While it is not in evidence, I assume that this alcohol was sold both to dealers and to consumers. It would only be a matter of conjecture as far as proof is concerned to say that the larger part was sold to dealers, and I am making no finding as to that, because there is nothing in the record to substantiate it, but it is a little unusual for a regular, generally recognized retail business to purchase two carloads of alcohol on a consignment basis. That might also have something to do with, or may have some reflection upon whether or not the defendants and their employees are engaged in commerce as contemplated by the terms and provisions of the Act.

Under all these facts and circumstances, thirty-five per cent of the entire parts business being admittedly wholesale, and another thirty-five per cent being sales to large customers, which only by a strict and highly technical legal definition could be considered a retail sale, at the same time and together with the fact that only thirty per cent of their business was to small consumers, which would be generally recognized as retail sales, with different prices for the same parts to each of the three classes of customers, and together with all the other facts and circumstances relating to the maintenance of two different establishments, one of which was admittedly a retail business, and the other phases of their business I am of the opinion, considering all those factors and circumstances, that the defendants' business is not what is generally recognized as a retail store, or a retail establishment, as contemplated by the terms and provisions of the Act in question. So, I conclude that the defendants do not come under the exemptions provided under Section 13(a) (2).

That brings us to the question as to whether or not the defendants or their employees are engaged in commerce, or in the production of goods for commerce. In determining that question it is of course also necessary for the Court to take into consideration all the facts and circumstances relative to their business, particularly with reference to the history of the defendants' experience with the Wage and Hour Law. When the defendants were advised that this law would become effective in October 1938, they, knowing their business better than anyone else, went to their counsel for advice as to whether or not their business might come under the terms and provisions of the Act, and advice as to what steps they should take in the reorganization or rearrangement of their business affairs so that they would not be liable to the terms and provisions of the Act. I am sure that counsel advised them at that time that their status was at least doubtful and in the event the question of their liability should be raised in the future, there were certain steps that should be taken so as to make certain they would not be subject to the terms and provisions of the Act. Accordingly, upon counsel's advice, the defendants, who at that time employed about three salesmen to sell their parts and supplies to the trade, part of which was located in the adjoining State of Kentucky, concluded that the services of these salesmen in making calls upon the trade should be discontinued, and that they should discontinue their out-of-state business of selling used parts and supplies to dealers, and so notified those customers. In addition, the question of the shipment of scrap iron, which at that time was becoming larger each year, must necessarily have been considered by counsel, and they were in all probability advised that as long as they made shipment of scrap iron in interstate commerce there would be a question as to whether or not they were subject to the terms and provisions of the Act. Therefore, they were advised to make other arrangements in this respect, and accordingly, they discontinued making any shipments in interstate commerce directly, and adopted the plan of selling their scrap iron and junk

to local dealers or brokers. This practice began in October, 1938, and continued up until the first day of December, 1939, when the defendants came to the conclusion that probably it would be better in all respects that they comply with the terms and provisions of the Wage and Hour Law and make an honest effort to live up to all the requirements of this statute. Just why this decision was reached does not appear clearly from the record, but evidently the very nature of the business transacted by the defendants must have had some relation to their decision to take this step.

There is the period from October 24, 1938, the date the Wage and Hour Law became effective, to December 1, 1939, the date these defendants, of their own accord, sought to comply with the statute, that the biggest dispute centers around in this record. Immediately, or a very short time after the Act became effective, the defendants called in their salesmen and instructed them not to go out of the State again, and advised their customers that they would not be doing business with them any longer, and their salesmen would not call upon them in the future. Nevertheless, quite a number of these Kentucky customers continued to send defendants their orders for parts by mail, telephone and telegraph, and apparently such parts were shipped without exception. The customers were not notified that parts could not be shipped them because the defendants were not any longer making out-of-state shipments. In addition, there were certain old customers from Kentucky that would come in person and make purchases at the establishment of the defendants. It is not shown just how large these purchases were, or how much the business of that nature amounted to. Of course, the defendants must have known that their old customers were coming in and buying these parts, yet it is probable that there were a number of parts sold to out-of-state customers, who were not known to the defendant at that time, and the defendants did not have knowledge that the parts would be taken out of the State by those customers. I am not particularly concerned with that question. I do not see how a retail or a wholesale parts business could be obligated to refuse to sell parts to a customer who resided out of the State when the person came to their place of business to purchase parts, and carry them away with him. Shipping them out of the State though in response to a telephone, telegraph, or mail order, is an entirely different question. As to the exact amount of that business, there is considerable doubt. There is an estimate here, or rather some answers to the interrogatories filed say that the different shipments during 1938 and 1939 ran all the way from $50 to probably $150 per month. However, there has been a definite showing that invoices of the defendants, which are unexplained, other than to say that they represent some returned goods, but this is only explained partially— those invoices show that the amount ran considerably higher than that.

Also, in answer to interrogatories the defendants estimate that during the period of time in question the dollar volume of goods produced by their wrecking business, which are identified as used parts, shipped without the State of Tennessee, amounted to approximately $2,000 but they say that it is impossible for them to state definitely as the records are not kept so the information can be ascertained in exact detail; that this $2,000 estimate refers only to an approximate amount, an estimated amount. Well, I am inclined to think from the evidence that I have heard relative to these particular matters that the defendants have attempted to minimize their business in this respect, and I find that, while I cannot say from the record the exact amount of this business, it considerably exceeded the sum of $2,000 just as I find that these monthly statements representing out-of-state business since October, 1938, have been minimized by the defendants, and that the amounts are more nearly what the plaintiff insists than what the defendants insist. At any rate, the defendants were doing business of this nature at their own risk, and they should have kept records on these particular shipments, so that if it ever came to the point of a question being made in the future the amount could be definitely ascertained, and the consequences of their failure to keep records in this connection naturally rests upon them.

All this, however, is only a part of the interstate business. A far larger portion of the defendants' interstate business is represented by scrap iron and steel sold by them. We have a situation where the defendants have been engaged in this business for some time, knowing their business and knowing their markets, and having consulted with their attorney relative to the nature of the business and their liabilities under the Act. Under the circumstances I

cannot conceive of the defendants saying at this time that they have had no knowledge that these shipments of scrap steel and scrap iron sold to local brokers were not to be made in interstate commerce. The main purpose of changing the nature of the shipments in October, 1938, or changing the nature of the sale of scrap iron in October, 1938, from direct shipments out of the State by the defendants to local purchasers of scrap steel and iron so that thereafter those articles would be sold locally, in itself and alone, convinces me that they knew of the character of the products they were producing and where it would be disposed of.

Furthermore, the scrap iron was cut up into pieces about fourteen inches long. Defendants say that was for the purpose of being able to get more iron into a car. It seems to me, of course, that by cutting it into smaller pieces you could probably get more scrap iron into a car than if you just loaded the frames intact, but it also seems there are certain operations that could be made upon a frame, where if you would have a piece of metal eight or nine feet long in one piece, it would not occupy as much room in a car as if that piece of metal were cut up into eight or ten different pieces, but that is not conclusive. On the other hand, Mr. Friedman testified that he advised these defendants that this scrap iron was being cut up into smaller pieces to meet specifications of the mill that was purchasing it, and that he gave them the size of the pieces into which the iron was to be cut.

■ In addition, there is the testimony of Mr. Merrill, a witness who, as far as this Court could tell from his testimony and demeanor, appeared to be a very friendly witness for the defendants. I do think he tried to tell the truth, and as far as the Government's case was concerned, he told the facts as he knew them, but there was no animosity on his part toward the defendants, and he did not volunteer anything that might have injured their cause. In fact, when certain matters, unfavorable to defendants relative to his employment, were brought out he apparently volunteered the information that such instances were not known to the defendants, and that is proper. I have no criticism of that, because I think that those were the facts and the Court was entitled to know them, but I merely state that from my observation I feel he was a friendly witness for the defendants. And he states that on one occasion in 1939 Mr. Julius Stillman told him to put a designation switch ticket on a freight car that was loaded with scrap iron. He further states that he has also loaded there on the yard serviceable second hand motors and rear ends of automobiles on out-of-state trucks. There were one or two other witnesses that testified that either Mr. Julius Stillman or Dave Stillman gave directions to place switch tickets on freight cars, but I am not placing much credence in these statements and am not considering them. However, I am impressed by the testimony of the witness Merrill in that respect. These shipments of scrap iron, or rather these sales of scrap iron, amounted to approximately $12,000 during the period of 1938 and 1939 in question, and Cline & Bernheim during this period purchased eighteen carloads of scrap iron from the defendants. The freight cars were loaded on a spur track across the street from the defendants' place of business, and were loaded by the employees of the defendants, and those employees, or some of them, cut the scrap iron and steel into the specified lengths on the defendants' yard. The Court therefore finds that by reason of their experience and all the facts and circumstances the defendants did know that the scrap iron or scrap steel in question was to be shipped in interstate commerce, and that the preparation of this scrap iron and steel amounted to production of goods for commerce, as contemplated by the terms of the Act in question.

■ Another circumstance in this connection is that Mr. Duke admitted himself that he knew in 1937 that Cline & Bernheim were selling scrap iron to a customer in Cincinnati. The Court finds, therefore, that the scrap iron business and the business of selling used parts to out-of-state customers was of an interstate character—and before proceeding any further along this line I wish to take up the question, or the fact that these defendants purchased a large part, practically all of their new parts, from outside the State, and resold them mostly in Tennessee. I am not concerned with those parts that were resold in Tennessee by the defendants, but some of those new parts were shipped to customers outside the State, and as to those parts that were purchased from out-of-state manufacturers and later resold by the defendants to out-of-state customers, I am of the opinion that such would constitute interstate business.

Just what proportionate part of the entire business of the defendants, or the entire business they did over this period of time, the used parts business sold out of the State and the new parts business sold out of the State and the scrap iron business, what that amounts to, is difficult to say. As I recall, the proof shows that the defendants did a gross business of about $200,000 a year, and the Court finds that the scrap iron business, the used parts business, and the new parts business, would amount to more than $15,000 a year. Just how much more the Court is unable to say, but in fixing an estimate from the proof, the Court is of the opinion that this scrap iron business, new parts business sold out of the State, and old parts business sold out of the State, would amount to around seven and one half, or ten per cent of the defendants' total business, and while in the aggregate that does not seem to be a very large percentage, yet the carrying on of such business, particularly the scrap iron business, physically constituted a large part of the defendants' business operation in relation to the space necessary, the number of workmen employed, etc. There was a yard maintained for that purpose and a number of men were employed to work in the yard. Most of their work was done in that connection and in its relation with the other business done by the defendants. It alone would amount to a sizeable business in itself. I would say that all the space and required number of employees incident to the preparation and shipping of eighteen or twenty carloads of junk of this particular kind would be a fairly large size business in itself, while possibly not so on the basis of percentage, in relation to defendants other business and that those employees who were connected with that part of the business were certainly employed and engaged in commerce, or engaged in the production of goods in commerce. The Supreme Court in the Darby case says that: "The recognized need of drafting a workable statute and the well known circumstances in which it was to be applied are persuasive of the conclusion which the legislative history supports, * * * that the 'production for commerce' intended includes at least production of goods, which, at the time of production, the employer, according to the normal course of his business, intends or expects to move in interstate commerce although, through the exigencies of the business, all of the goods may not thereafter actually enter interstate commerce." United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609, 132 A.L.R. 1430.

■ The Court therefore concludes that in the reclaiming of these automobile parts and the repair of them, and the production of scrap iron, the defendants, in this case, according to the normal course of their business, intended or expected those articles to move in interstate commerce, and that the employees engaged in the production thereof were employees engaged in commerce, or in the production of goods for commerce, as contemplated by the terms and provisions of the Act.

■ That brings the Court down to the most complex problem of this suit, which is the application of the plaintiff for an injunction. There has been considerable evidence introduced in this respect that the Court considers immaterial, so with one exception I am going to disregard all such evidence and not make any finding on those facts, and will confine the finding of facts to those matters that I consider material. One matter though I shall mention that is not considered particularly material, but which is the exception I refer to, is the question of keeping the time cards, about which considerable complaint has been made. In the beginning, when the defendants instituted this system they made a rule that if an employee was a minute late he could not go to work until a quarter of an hour following the time at which he was supposed to check in. Later this rule was changed so that the employee was allowed three minues after check-in time before the rule was effective. I realize that the employer must make some regulation in that respect, otherwise his employees would come in at any time that suited them best, especially if they knew that they would not be penalized for it. That is human nature. Some of them will. Of course, there are others that will not, but a large number of them will. I am not prepared to say at this time that the rule in the case of an employee being three minutes late, he is not allowed to go to work until a quarter of an hour after, is unreasonable. It has been insisted here that a fair rule would be that the employee be given credit for the hour, or quarter-hour closer to the time he actually punched in. In other words, if an employee, supposed to report to work at eight o'clock, punched in at 8:07, his time should start at eight o'clock instead of 8:15 because seven minutes after eight is closer to eight than to 8:15; whereas, on the other hand, if he punched in at eight minutes

after eight, his time would not start until 8:15. Well, there probably would be a lot of employees that would take advantage of that and make it a rule not to get there until six or seven minutes after they were supposed to go to work, and I am making no ruling as to that, and am not making any particular criticism at this time of the three-minute rule which defendants have adopted. However, it seems that their position would have been much better if the rule had been a little more reasonable, say five minutes after eight. Three minutes seems a rather short time. It is a proposition on which you have to give and take. It is difficult to lay down any definite, fixed rule on such matters.

■ Neither am I criticising defendants' rule that the employees have their hours of work especially set, and that in order for them to be entitled to overtime, if they work after the hour set at which they are to quit, they are required to have the overtime okayed by the manager. I can see the necessity for that rule, and I have no criticism to make. Otherwise, there would be some employees laying out and loafing around or making a particular point not to finish up their work so as to be allowed overtime.

There is also the instance complained of by the witness Kathrine Taylor, who was supposed to go to work on Monday and went down on Sunday to learn something about her duties. She testified that for a period of a week, she, at Mr. Duke's request reported to her work an hour early for the purpose of learning to operate the switchboard. Her hours were from ten to six with thirty minutes off for lunch, and she reported at Mr. Duke's request at nine o'clock, making her work eight and one-half hours, instead of seven and one-half each day. She was what is known as a learner, and the Act specifically provides for steps to be taken relative to the pay for learners, and she was not paid for those extra hours each day for a period of a week.

Another violation complained of is the fact that the witness Merrill was asked to move some compressors after work hours; that he and a crew of two men spent about twenty or thirty minutes on that occasion moving those compressors. That was work being done for the defendants, and while Merrill says that Mr. Stillman did not know that he had checked out, yet Mr. Stillman was bound to have known that it was after working hours, and there were thirty minutes on that occasion that those men worked for which they were not paid. I am not making any finding as to the other incident related by Mr. Merrill.

■ There is also complaint made of meetings that were held at night for a period of a couple of months in the early part of 1939 at which the salesmen were expected to be present. Those meetings began about seven-thirty at night and sometimes lasted until eleven or twelve o'clock, but that part of the meeting pertaining to the defendants' business only occupied an hour or an hour and a half, and the rest of the time the employees spent there was devoted to their own personal pleasure. It is doubtful as to whether those meetings were entirely voluntary or not. I think the employees felt that they were expected to be there, although no one was ever fined or no employee disciplined on account of not being present, and besides, those meetings have been voluntarily discontinued. They only applied to the salesmen, whom the Court considers in a little different category from the ordinary laborers, and it is not unreasonable to have meetings of this kind if they are on a purely voluntary basis, but the employer should be very careful that they are on such basis; otherwise, there could be justifiable criticism in some instances.

Then there is the violation complained of relative to Sam Davis. Well, the Court finds that Sam Davis was an employee of the separate retail branch of the business, and that he is not concerned in this particular inquiry.

That brings us to the question of why the employee and the complainant in one of these cases, Thurmon Richardson, was fired. I am not at all satisfied with the reason given as to why Thurmon Richardson was fired. The defendants say that he was fired because while he was on duty a file containing some important information pertinent only to the defendants' business disappeared. That file was not important to Thurmon Richardson in any way. The only way it could have been important to him was either for him to sell it to some competitor, or for him to allow some competitor to steal it, for which he would be compensated in either case. It seems to me however, that if this employee had been occupying a position of trust, such as a night-watchman does occupy, and if the defendants were definitely convinced that he had com-

mitted the theft of some article valuable to their business, they would have fired him right then and there, instead of moving him to another job. The evidence on this particular matter does not show that Richardson was in any way particularly questioned about the matter, or confronted with the charge that he had either stolen the file or allowed it to be stolen, but was just asked about it, and it is not definitely shown from the evidence that it was misplaced or taken from the office of the defendants at a time that Richardson was on duty. It might have been taken at some other time by some other employee. The defendants did not seem to be absolutely convinced in their own minds that Richardson was guilty, from the way I interpreted their testimony, or the way I understood it, and if they had been convinced that Richardson was guilty, they should have fired him right then instead of giving him another job for about a week and then firing him because he was inefficient on that job.

Mr. Duke says that on the night in question Richardson came in late and that he asked Richardson if he had seen this record, a cylindar record, I believe, is what he said, and Richardson said he didn't know anything about it. Whereupon Mr. Duke says he told him that he hoped that his union was not going to keep him out late at night, and that therefore, to give up his keys and report to the yard the next next morning for work. I am inclined to think that probably the activities of Richardson's wife with the C. I. O. and her union activities, and the fact that Richardson was probably agitating something about the Wage and Hour Law, possibly had more to do with his being fired than the fact that these records were missing. Merrill also testified that Mr. Julius Stillman sent him to Richardson's house on one occasion to see what was going on out there about union activities, and he came back and reported to Mr. Stillman that he had been out there and there were some men out there at the house, but that nothing was said relative to a union, but some mention was made of the Wage and Hour Law. However, Mr. Merrill says that this occurred after Richardson had been fired. I don't know why Mr. Stillman would have been sending Merrill out to Richardson's house on this errand after Richardson had been fired unless it was that he wanted to check up on his activities in connection with the Wage and Hour Law or the union organization.

On all of these items alone, standing by themselves, the Court is doubtful that it would grant the application for an injunction in this case, but there is a more important matter to be considered. That is, under the Court's findings the defendants in this case owe those employees who worked, or were engaged in commerce, or in the production of goods for commerce, from October 24, 1938, to December 1, 1939, additional wages not paid in accordance with the Act, and for hours more than the minimum specified under the Act, and that these employees, not having been paid in accordance with the Law, the Wage and Hour Law, the defendants at this time are still violating the law, and for that reason, considered with all the other circumstances mentioned, the Court will grant the application for an injunction in this case in part. That part will cover violations prohibited under Section 15(a) (1) and Section 15(a) (2).

Section 15(a) (3) reads that it shall be unlawful to discharge or in any manner discriminate against any employee because such employee has filed any complaint, or instituted or caused to be instituted any proceeding under or relating to this Act, or has testified, or is about to testify in any such proceeding, or serve or about to serve on any investigating committee. The Court finds in this case that the plaintiff Thurmon Richardson, is the only employee that complains of having been discharged, and that at the time of his discharge he had not filed any complaint, or instituted or caused to be instituted any proceeding under or relating to this Act, nor had he testified or was about to testify in any such proceeding. For these reasons, the injunction will not cover Section 15(a) (3) of the Act, nor will it cover Section 15(a) (4), which relates to child labor, or Section 15(a) (5) but only Sections 15(a) (1) and 15(a) (2).

I will next consider the case of Thurmon Richardson, and in connection with his duties in the production of goods and the nature of the business of the defendants, the Court makes the same finding relative to the business of the defendants in this case as was made in the case of Fleming v. Stillman. In this case the plaintiff is a night watchman and it was part of his duties to watch those particular articles which were being produced,

on the yard of the defendants, both the scrap iron and steel, and the automobile parts which had not been taken from wrecked automobiles, also those automobile parts that had been taken from wrecked automobiles, which were in the store-room of the defendants, and to be sold in interstate commerce, and new automobile parts, which were to be sold in interstate commerce. The language of the Act, "Employees * * * engaged in commerce or in the production of goods for commerce," the Court construes as not necessarily meaning that employees have to actually work on articles with their hands or tools, or to cut them up with torches. The Court is of the opinion that an employee may be engaged in commerce without actually doing any manual labor, and produce goods for commerce, or be engaged in the production of goods for commerce, without actually doing any manual labor necessary to prepare those goods for commerce. Take for instance, a manufacturing company that is engaged in manufacturing lumber for commerce. There are certain office details and bookkeeping in connection with the business that has to be done by somebody, and it is part of the production of those articles for commerce, and the Court would feel that such employees would be just as much engaged in the production of goods for commerce as would the men who actually take the planks from the saw as they come off the log, and there are authorities which hold that in such circumstances an employee who works in the capacity of a night-watchman and watches such articles as parts and keeps them from being stolen, and sees that they are not destroyed by fire, and other things, is engaged in the production of goods for commerce. The Court is inclined to follow those decisions. As counsel for plaintiff stated in his argument, the Supreme Court of Tennessee, just within the last few days, has made a similar decision, and other Courts, Federal Courts, have followed this same line of authorities.

The Court, therefore, concludes that this plaintiff was engaged in commerce, or in the production of goods for commerce, as contemplated by the terms and provisions of the Act. It appears that from October, 1938, to April, 1939, this plaintiff was also employed by a coal yard, which adjoins the plant of the defendants, to watch the coal on this yard, and for that he was paid the sum of fifty cents a night, or $3.50 a week; that he was first employed by the defendants on the basis of $14 a week, and later raised to $15 before December 1, 1939, when the defendants voluntarily decided to comply with the Wage and Hour Law. He worked from October, 1938, to October, 1939, at $14 a week, and from October, 1939, to December 15, 1939, for $15 a week, and that was when the defendants voluntarily decided to comply with the Wage and Hour Law, and in December, 1939, the hours of this plaintiff were changed. He had previously been going to work at 5:30 o'clock P. M. and getting off at 7:00 o'clock the next morning. After the defendants decided to comply with the terms and provisions of this Act, his hours were changed from 12:30 midnight, when he went to work, until 7:00 the next morning. That is not particularly important in this case, however, as he makes no complaint about not having been paid in accordance with the Wage and Hour Law, or working in excess of the hours stated by the Wage and Hour Law since December 1, 1939, but before he worked, according to this evidence, about thirteen and one-half hours, a night, for which he was paid $2 a night, and taking into consideration the fifty cents a night that he received from the coal yard, he made $2.50 a night. He made hourly trips over to the coal yard and punched a clock at two specified points, and the only way that the Court can fix definitely what time he worked for the coal yard and what time he worked for the defendant would be to base it on the proportion of his pay. The Court finds that the pay he received from the coal yard amounted to twenty per cent of all his pay, and that twenty per cent of the hours that he worked in all would be two hours and forty minutes each night allocated to work for the coal yard. The remainder of the thirteen and one-half hours would be ten hours and fifty minutes that he worked for the defendants each night that he worked. I am not making any finding as to the number of nights that he worked, because I do not have the necessary records before me, and unless you gentlemen can agree from the payroll records on the number of nights that he worked and the compensation that would be due on the above basis, I shall have to order a reference to determine the question. It seems to me you should have no difficulty in arriving at that from the records. The

basis outlined, however, relative to Richardson's employment is only effective up to April, 1939, at the time he was discharged by the coal company. After that he worked on the basis of thirteen and one-half hours each night for the defendants up until December 1, 1939.

Considering the case of the plaintiff Stewart, the Court makes the same finding of facts relative to the business of the defendants as it made in the case of Fleming v. Stillman, and the case of Richardson v. Stillman. The Court finds that Stewart was working for the defendants in October, 1938, when the Wage and Hour Law became effective, that he was working on the yard, and drove the yard wrecker which moved the wrecked automobiles, and turned the motors over while employees were taking them out of their frames and carried the chassis and other parts, to different parts of the yard to be cut up. He also kept up the motors on the large shears, which were used to cut iron, kept those motors in repair, and kept the shears running; that he helped load the cars that were shipped in interstate commerce with junk; that he also cut up frames for the purpose of being shipped in cars in interstate commerce, cut the frames with an acetylene torch used for that purpose, and that he was employed by the defendants in the production of goods for commerce. The Court does not make any finding as to the exact number of days that he worked during this period or the exact number of hours each day, or the wages due him, and unless counsel can agree on that from the records, I shall also order a reference in his case.

The injunction prayed for will issue as herein provided.