**WEST KENTUCKY COAL CO. v. WALLING, Administrator of Wage and Hour Division, U. S. Dept. of Labor.**

No. 10044.

Circuit Court of Appeals, Sixth Circuit.

Feb. 12, 1946.

James G. Wheeler, of Paducah, Ky. (James G. Wheeler, of Paducah, Ky., and Lucius E. Burch, Jr. and C. O. Franklin, both of Memphis Tenn., on the brief), for appellant.

Faye Blackburn, of Washington, D. C. (William S. Tyson and Bessie Margolin, both of Washington, D. C., Glenn Elliott, of Nashville, Tenn., and Faye Blackburn and Helen Grundstein, both of Washington, D. C., on the brief), for appellee.

Before ALLEN and MARTIN, Circuit Judges, and PICARD, District Judge.

ALLEN, Circuit Judge.

The District Court issued an injunction restraining the appellant from committing violations of the Fair Labor Standards Act, Title 29, U.S.C. § 201 et seq, 29 U.S.C.A. § 201 et seq. The principal questions presented are whether appellant's employees are engaged in commerce or in production of goods for commerce, and are exempt from the operation of the Act by reason of being employed in a retail establishment, within the meaning of § 13(a) (2) of the Act.

Appellant, a New Jersey corporation, owns and operates coal mines in Kentucky and with two of its subsidiaries distributes coal in Kentucky, Tennessee, Arkansas, Mississippi, and other states. It transports coal on its own railroad in Kentucky and on its barges on the Ohio and Mississippi Rivers. The instant controversy relates to appellant's sales outlet in Memphis, Tennessee, from which coal is distributed to Tennessee, Arkansas, Louisiana and Mis-

sissippi. Appellant has connected with its Memphis establishment two coal yards, an uptown office, a barge fleet on the Arkansas side of the river, a tugboat and equipment for loading and unloading coal, and elevators with power-driven machinery for screening and sorting coal. In this case we are not concerned with the operation of yard No. 2. About 35 persons are employed in yard No. 1 unloading, ordering, receiving and handling coal sent in from other states, or distributed outside of Tennessee, preparing it for use and supplying it to various consumers, including local manufacturers who use it on a large scale in the production of goods for interstate commerce.

As a basis for its holding that these employees were engaged in the production of goods for commerce, within Title 29, U.S.C., § 203(j), 29 U.S.C.A. § 203(j), the District Court made extensive findings of fact which reveal in substance that all coal distributed at Memphis comes from outside the state and is unloaded by appellant's Memphis employees who feed the coal into elevators for screening. All of the Memphis employees are under the supervision of the local manager. They are transferred at need from one job to another, certain of them working in turn on the steam shovel, the conveyor, the elevator, unloading from freight cars, acting as watchmen, performing services on the tug, maintaining the unloading and screening equipment and making truck deliveries. Substantial quantities of coal are sold to boats and barges operating in commerce on the Mississippi, and truck deliveries to concerns engaged in the production of goods for commerce constituted more than 50% of the total of truck deliveries for the period from January 1, 1943, to June 30, 1943.

The District Court's findings of fact are based upon substantial evidence and support its conclusions. Employees who unload extrastate goods are engaged in commerce [Allesandro v. Smith, 6 Cir., 136 F.2d 75, 149 A.L.R. 382; Walling v. Consumers Co., 7 Cir., 149 F.2d 626], as are also employees participating through clerical work or otherwise in the receipt of coal from other states and in the handling and transporting of coal on extrastate orders. Walling v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, 398, affirmed and modified, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 338;

339. Employees engaged in screening, processing and preparing goods for interstate distribution are engaged in the production of goods for commerce, for the term "produced" in the statute relates "to all steps, whether manufacturing or not, which lead to readiness for putting goods into the stream of commerce." Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 342. Moreover, more than 50% of appellant's coal is used in the manufacture of goods for commerce. It follows that appellant's employees who furnish coal for such use or engage in a process or occupation necessary for the use of coal in such production are covered by the Act. Walling v. Roland Electrical Co., 4 Cir., 146 F.2d 745; Reynolds v. Salt River Valley Water Users Ass'n, 9 Cir., 143 F.2d 863. The District Court correctly concluded that appellant's employees are engaged in commerce or in a process or occupation necessary to the production of goods for commerce and are covered by the Act unless exempted by its terms.

The most important question in the case is whether the appellant's employees are exempt from the operation of the Fair Labor Standards Act within the meaning of § 13(a) (2), Title 29, § 213(a) (2), 29 U.S.C.A. § 213(a) (2), which provides that sections 206 and 207 "shall not apply with respect to * * * any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The Fair Labor Standards Act constitutes humanitarian and remedial legislation, Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949, and any exemption from these provisions must be narrowly construed. A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 157 A.L.R. 876.

Appellant's intrastate sales for the six-month period preceding the trial constituted 69.52% of total sales. It urges that within the definition of "retail" generally accepted in the coal industry, as shown by definitions of the Solid Fuel Administration for War, the Bituminous Coal Division, the Office of Defense Transportation, the Office of Price Administration, and the testimony of witnesses long connected with the coal industry, the operation of the Memphis outlet is, without controversy, retail. These administrative offices and coal dealers in substance define a retail

sale as being any sale of less than a car-load lot of coal, and this record shows that more than 50% of the coal handled through the Memphis outlet is sold in less than carload lots, being distributed by truck.

The District Court, although concluding that the definition accepted by the coal industry and the governmental agencies might be considered by the court in determining whether or not a business comes within the retail exemption, held that the definition is not controlling, decided that the exemptions accorded retail establishments under the Act must be applied uniformly to all engaged in commerce or the production of goods for commerce, and that the appellant's Memphis outlet does not fall within the meaning of "retail establishment" under the statute.

The definition of retail used in the coal industry has existed over a number of years prior to the enactment of the Fair Labor Standards Act, and cannot therefore be said to have been devised in order to secure an exemption from the statute. However, we think the court correctly construed the statutory term under the facts in this case. The special trade meaning, though long established, is not controlling. Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, supra, 321 U.S. 590, 602, 64 S.Ct. 698, 88 L.Ed. 949. The Administrator is not authorized to define the term "retail," since his only authority in the field of definition relates to other terms listed in § 13(a) (1) and § 13 (a) (10) of the Act, Title 29, § 213(a) (1) and (10) 29 U.S.C.A. § 213, (a) (1, 10). Therefore we do not construe his interpretative bulletin defining retail, but seek the congressional intent in the ordinary meaning of the words employed. Thus tested, appellant's very considerable transactions in Memphis reveal by the character of the trade carried on with reference to the quantity of goods sold to individual customers, the varying and non-uniform prices received, and the use made of the coal by those who purchase it, that the greater part of the selling of the Memphis outlet falls outside of the ordinary meaning of the word "retail." As defined by Webster, a retail sale is a sale "in small quantities or parcels * * * directly to the consumer." This is contrasted with wholesaling, in which the purpose of the customer is to resell the goods or to use them for business needs. 13 Encyclopedia of Social Sciences, 411. A test of wholesaling, as stated by Beckman and Engle in Wholesaling, Principles and Practice, is whether the purchaser is actuated solely by a profit or business motive in making the purchase, or by a desire to satisfy his own personal wants or those of his family or friends. When the profit motive dictates the purchase the transaction has one of the earmarks of wholesale. Cf. Standard Industrial Classification Manual, Bureau of the Budget, Vol. II, p. 35, Wholesale and Retail Trade.

By far the greater part of appellant's sales are not designed for domestic or small-scale consumption. Appellant produces large quantities of pea or slack coal, which is not suitable for individual use in homes, being a kind which can only be used in large furnaces and special equipment. Cf. Walling v. Consumers Co., supra, 149 F.2d at page 631; Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90. Lonas v. National Linen Service Corp., 6 Cir., 136 F.2d 433, 150 A.L.R. 697, does not conflict with this conclusion. It deals with the question of exemption for a service establishment, and not for a retail concern. Over 50% of appellant's product is delivered for the use of factories, office buildings, large apartment houses, governmental agencies, and institutions, while from 25% to 40% of it is sold in carload and barge lots to boats moving on the river.

A majority of these sales are made in very large quantities, the bulk of them being made to the consumers just described, and to dealers and peddlers who resell the coal. Only a very few of the sales from the Memphis outlet are made to domestic consumers.

Appellant's method of solicitation and handling of many of these transactions is characteristic of wholesale, rather than retail transactions. During the period in controversy, appellant used a representative called "a wholesale salesman," and negotiated many long-time contracts called "wholesale contracts." The telephone directory listed the appellant as a wholesaler. The contracts established prices charged to commercial and industrial consumers, institutions and governmental agencies, determined by the type of customer, the quantity, the frequency with which the customer will accept delivery, the duration of dealings between the seller and purchaser, and the prospect of re-order, type of delivery, and competition. The price arranged

for was not uniform even to large purchasers, the difference in price being due not merely to a difference in grade of coal, but to a difference based upon the elements above mentioned, as found by the District Court. It was considerably lower than retail in all cases, and was in fact a discount varying according to special circumstances and granted to a particular group of buyers. This is a mark of the wholesale transaction: Fleming v. Stillman, D.C., 48 F. Supp. 609; Guess v. Montague, D. C., 51 F.Supp. 61, affirmed, 4 Cir., 140 F.2d 500.

Since all of these characteristics combine in a majority of the appellant's sales from the Memphis outlet, the District Court correctly concluded that it is not a retail establishment and not exempted by the Act. While the decision of the Supreme Court in Roland Electrical Co. v. Walling, 325 U.S. 849, 65 S.Ct. 1566, covers the question whether certain employees were exempted from the Act on the ground that they worked for a "service establishment," within the meaning of § 13(a) (2), the interpretation of the word "retail" therein given supports and indeed requires our conclusion upon this point.

Nor did the court err in holding that appellant's truck drivers are not exempt from the operation of the statute under § 13(b) (1), which provides that the overtime provisions of the Fair Labor Standards Act shall not apply to "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935." The Supreme Court, in construing this exemption, held that the power of the Interstate Commerce Commission under § 204 of the Motor Carrier Act, 49 U.S.C.A. § 304 "is limited to those employees whose activities affect the safety of operation." United States v. American Trucking Assns., 310 U.S. 534, 60 S.Ct. 1059, 1069, 84 L.Ed. 1345. The activities of appellant's truck drivers do not fall within this category. It was held in Fletcher v. Grinnell Bros., 6 Cir., 150 F.2d 337 that the exemption applies only if the employees in question have devoted a substantial part of their time to driving motor vehicles in interstate commerce. Here it was found that the truck drivers spent a substantial portion of their time in activities other than truck driving, and that a major portion, and frequently all of their time, was spent in making intrastate deliveries necessary to the production of goods for commerce. The only evidence on this point presented by appellant was that of two drivers who made occasional deliveries across state lines. This testimony clearly is not of the substantial character required to render the exemption applicable.

A closer question is presented by appellant's objection that the District Court erred in taxing in the costs $560.72 which was alleged to have been expended in making proof of facts which appellant refused to admit or deny. The sum consisted of amounts paid as salary and per diem allowance for the senior attorney in the office of the solicitor for the United States Department of Labor, a senior inspector, and an inspector, who were engaged for a number of days in examining the books and records of the appellant. The Administrator, before trial, under Rule 36 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c had filed a series of requests for admissions of fact which in substance asked appellant to admit that for each six months' period from January 1, 1939, to June 30, 1944, it sold more than 50% of its coal from the Memphis outlet, both in ton and dollar value, to commercial and industrial consumers, and to dealers at prices substantially less and in quantities substantially greater than the prices charged and the quantities sold to individual and domestic consumers. Later the parties agreed that the period from January 1, 1943, through June 30, 1944, should be considered the representative period.

Appellant filed a motion to suppress the requests for admissions upon the principal ground that the matters of fact requested to be admitted were irrelevant and immaterial. It stated that it would involve much time and labor to check its records for this period; that the requests could not be answered within the time fixed; that the court had ordered appellant to make available for examination by the Administrator all necessary records; that the requests could not be answered categorically, and finally contended that all of the coal in its two coal yards at Memphis was sold at retail. The Administrator moved to strike the response, contending that the appellant had neither specifically denied the matters of which admissions were requested nor set forth any reasons why the appellant could not truthfully either admit or

deny such matters. The court found that the issues concerning which requests for admission were filed were relevant, but held that it had no power to sustain the motion to strike, and therefore denied it. The Administrator's contention that the appellant had neither specifically denied nor set forth any reasons why it could not truthfully admit or deny the facts concerning which admissions were requested, is plainly correct. The District Court, after trial, held that the appellant had not complied with the rule, having set out no adequate reason why it could neither admit nor deny the truthfulness of the facts requested. This being the case, the further provisions of Rule 36 come into play, that "Each of the matters of which an admission is requested shall be deemed admitted unless, within a period designated in the request, not less than 10 days after service thereof or within such further time as the court may allow on motion and notice, the party to whom the request is directed serves upon the party requesting the admission a sworn statement either denying specifically the matters of which an admission is requested or setting forth in detail the reasons why he cannot truthfully either admit or deny those matters." At this point, therefore, all of the matters concerning which the Administrator had requested admission under Rule 36 were deemed admitted and no further proof was necessary; but the Administrator proceeded with the investigation nonetheless. When a party investigates and proves facts on the record admitted, it cannot tax opponent with the costs of such investigation.

The order taxing the appellant with the amount of $560.72 as part of the costs is reversed. In all other respects the judgment of the District Court is affirmed.