**NORTHWESTERN–HANNA FUEL CO.**
**v. McCOMB.**
No. 13513.

Circuit Court of Appeals, Eighth Circuit.
March 10, 1948.

---

5 See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239.

934

Pierce Butler, of St. Paul, Minn. (Edgar G. Vaughan, of St. Paul, Minn., on the brief), for appellant.

Morten Liftin, Chief Appellate Section, U. S. Dept. of Labor, of Washington, D. C. (William S. Tyson, Sol., Bessie Margolin, Asst. Sol. and Irving M. Herman, Atty., all of Washington, D. C., and William A. Lowe, Regional Atty., U. S. Dept. of Labor, of Chicago, Ill. on the brief), for appellee.

Before GARDNER, THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The suit is one against Northwestern-Hanna Fuel Company by the Administrator of the Wage and Hour Division, to enjoin further violations of the overtime and record-keeping requirements of section 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act, 29 U.S.C.A. § 215 (a) (2) and 215(a) (5). The trial court granted an injunction and the Fuel Co. has appealed.

Involved are operations at the two coal yards of appellant in St. Paul, Minnesota, one known as "Yard 8" and the other as the "River Dock". One of the issues in the trial court was coverage under the Act, but that question is not argued here, since appellant concedes that one of the grounds on which the finding of coverage rested cannot be contended to be clearly erroneous for review purposes.[1] Another issue was whether the exemption of section 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2), was applicable to the operations, as those of a "retail or service establishment the greater part of whose selling or servicing is in intrastate commerce". The trial court's determination of non-exemption as to each yard is sought to be reviewed. Appellant has also filed a motion to remand the case, should its claim of exemption fail on the appeal, to allow it to attempt to escape the injunction under the provisions of section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258, enacted since the appeal was taken.

On appellant's claim to exemption, the trial court found and concluded that the sales of coal at each yard, under appellant's own classification of its operations, consisted of three general types—"domestic", "steam" and "dealer"; that domestic sales were those made to dwelling houses, duplexes, apartment buildings and small stores or shops, whose total consumption of coal was less than 25 tons

[1] The trial court held that employees at each yard were engaged in interstate commerce and in the production of goods for commerce, within the meaning of the Fair Labor Standards Act. Appellant's brief concedes only that the evidence is sufficient for appeal purposes to sustain the finding of coverage on the ground of employees being engaged in the production of goods for commerce (because of the use made of coal by some of the customers to whom it was sold). The brief further says that in this situation the finding as to employees being engaged in interstate commerce is error without prejudice and does not entitle it to a reversal on the question of coverage. No attempt is made to demonstrate that the finding that employees were engaged in interstate commerce is itself erroneous, and we therefore do not examine the question. Also cf. Meeker Cooperative Light & Power Ass'n v. Phillips, 8 Cir., 158 F.2d 698, 699.

annually and the deliveries to which were characteristically made on adjusted load weights; that steam sales were those made to industrial or commercial establishments, large apartment buildings, schools, churches, institutions and governmental subdivisions or agencies, whose total consumption of coal was 25 tons or more annually (whether obtained from appellant or not), which bought coal of a kind and size not generally suited to the heating equipment of ordinary dwelling houses and in any event on a lower price basis than such coal normally would have been sold for to a domestic customer, and the deliveries to which were characteristically made in lots of three tons or more on unadjusted load weights; that dealer sales were those made to other dealers or to peddlers for resale by them; that, during the two fiscal years covered by the evidence as to Yard 8, 44.6 per cent and 37.5 per cent of appellant's total sales of coal at that yard, for those years respectively, had been steam and dealer sales; that similarly, during the one fiscal year covered by the evidence as to the River Dock,[2] 96.6 per cent of appellant's total sales at that yard had been steam and dealer sales; that, if Yard 8 and the River Dock were considered together as a unit, instead of as separate establishments, the general percentage of steam and dealer sales at both yards, for appellant's last fiscal year, would be 49.1 per cent; that the steam and dealer sales were not operations which appellant was entitled to have classified as those of a "retail establishment" in attempting to qualify for exemption under section 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2); that, also, the special trade concept in the coal industry, of a "wholesaler" as one whose sales were made in carload lots, and of a "retailer" as one whose sales were made in lots of less than a carload, was not determinative in the present case of the content of the term "retail establishment", in the general industrial reach of the Fair Labor Standards Act; that, furthermore, the fact that this concept of the coal industry had been accepted and adopted in other statutes relating to that business, or in administrative regulations promulgated under such legislation, similarly did not make it necessarily controlling or indicative of congressional intent under the Fair Labor Standards Act; that the courts had the right and would consider, beyond the special trade concepts of particular industries, the general recognized meaning of the term "retail" in common usage and would view the question against the background of the general remedial purposes of the Fair Labor Standards Act and also in the light of any previous reasonable administrative interpretations of it, in arriving at the signification of the term "retail establishment" in the immediate statute; that on the basis of these considerations, as previously indicated, appellant's steam and dealer sales were not entitled to be regarded as "retail" operations within the meaning of the Fair Labor Standards Act; and that these steam and dealer sales constituted such a substantial part of the business at each of the two coal yards as to disqualify each yard for general exemption as a "retail or service establishment". See Walling v. Northwestern-Hanna Fuel Co., D.C.Minn., 67 F.Supp. 833, 837.

■ On the statute, the previous indicative decisions, and the evidence in record, we think appellant is unable to so escape these findings and conclusions as to entitle it to have held on this appeal that it is within the exemption.

The Supreme Court has said in Roland Electrical Co. v. Walling, 326 U.S. 657, 666, 675, 66 S.Ct. 413, 417, 421, 90 L.Ed. 383, that the exemption of section 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2), "reaches employees of only such retail or service establishments as are comparable to the local merchant, corner grocer or filling station operator" and that for purposes of the exemption "the meaning of the word 'retail' [may properly be] restricted to sales made in small quantities to ultimate consumers to meet personal rather than commercial and industrial uses of those articles * * *." The opinion, by quotation from various sources of definition, emphasizes that the term "retail" in basic

---

[2] At the time of the suit, the River Dock had been in operation for only one full fiscal year.

general concept implies sales of goods in small quantities, with the purchases made for personal or household consumption and not for business purposes. The Court takes occasion to add also that the views expressed in the opinion are reinforced by the interpretations made by the Administrator of the Wage and Hour Division in his Interpretative Bulletin No. 6, and that these administrative interpretations of the Act "are entitled to great weight." 326 U.S. at pages 676, 677, 66 S.Ct. at pages 421, 422, 423.

Interpretative Bulletin No. 6, issued by the Administrator, provides in paragraphs 50 and 51 as follows: "Generally, sales of coal for private-home consumption will be considered retail sales. Sales to business or commercial users will also be considered retail if made in approximately the same quantity or at approximately the same price as that charged the ordinary home consumer. On the other hand, sales of coal to hotels, apartment houses, office buildings, factories, railroads, public utilities, Federal, State, or municipal governments, etc., will not be considered retail if such sales involve quantities of coal materially in excess of the quantity purchased by home consumers and a discount from the regular retail price charged home consumers is granted. If regular and recurring deliveries of coal are made as in the case of a hotel daily receiving deliveries of coal and a discount is given, the transactions will not be considered retail even though the separate deliveries may be in quantities not materially larger than those normally made to private homes. In determining whether a coal yard is a retail establishment the Administrator will examine the types of sales made. If a substantial portion of the selling is nonretail, the exemption will be defeated."

The practical tests set out in paragraphs 50 and 51 of Interpretative Bulletin No. 6, as a guide to administrative enforcement, in dealing with the exemption of coal yards as retail establishments, can hardly be regarded as being more restrictive than the definition of the term "retail" declared in the Roland Electrical case to be implied by the Act. Under the definition of that case, as above indicated, in considering whether the operations of a business are entitled to exemption as those of a "retail establishment", the courts properly may view as nonretail such types of sales as are not characteristically made (1) in small quantities, (2) to ultimate consumers, (3) for personal or household uses. These are, of course, all primary earmarks and are not to be taken to mean that other helpful indicia of the nonretail character of sales may not also exist, such as some of those which the Administrator has suggested as administrative guides.

The trial court regarded the steam and dealer sales here, under appellant's own classification of its operations, as alone sufficient to indicate that the two coal yards involved were not entitled to exemption generally as retail establishments. Appellant argues that it was error to treat all of its steam sales as nonretail, since a considerable portion of them, such as those to governmental subdivisions or agencies, schools, churches and other institutions, could not be said to be purchases for commercial purposes.

Under the definition in the Roland Electrical case, all sales to purchasers for business uses would be entitled to be treated as nonretail sales for purposes of section 13(a) (2) of the Fair Labor Standards Act. And, as opposed to personal or domestic uses, purchases of coal to enable public business or service to be performed or activities of groups to be conducted (denominational, parochial, fraternal, social, etc.) are, we think, in a sufficient general sense business uses, even though a commercial or profit motive may not be involved.[3] In any event, in terms of appellant's operations (quantities, prices, kind, grade and delivery handling) such sales had the same attributes as sales made by appellant for commercial and industrial purposes and not those of sales made for domestic use. All this is clearly sufficient

---

[3] Cf. Bowles v. Mannie & Co., 7 Cir., 155 F.2d 129, 134: " * * * we believe it will be enough to say that even if an institution may be considered an ultimate consumer, it will not be precluded from being a commercial user."

here to sustain the trial court's treatment of them as nonretail sales.

■ Appellant argues also that it was error to treat its dealer sales as being sales at all, in a classification of its operations, because such sales were primarily made for accommodation and without profit to appellant. But they were actual sales transactions; the fact that they were made without profit did not change their legal aspect; they involved work operations which appellant's employees were engaged to perform; and the purchasers were admittedly acquiring the coal for resale purposes, so that the sales were in no manner of a retail nature. In determining whether appellant's operations had a substantial nonretail pattern, the trial court therefore was not required to ignore these sales, as appellant contends. It may be noted also that West Kentucky Coal Co. v. Walling, 6 Cir., 153 F.2d 582, and Walling v. Consumers Co., 7 Cir., 149 F.2d 626, have apparently similarly treated such sales.

On the basis of appellant's steam and dealer sales alone, as set out in the trial court's findings, 44.6 per cent for one fiscal year and 37.5 per cent for the next, of appellant's sales of coal at Yard 8, and 96.6 per cent of its sales at the River Dock for the one fiscal year covered as to that yard, were of a nonretail nature. Each of these percentages was clearly so substantial in the general situation as to entitle the trial court to hold that appellant's operations at each yard were sufficiently shown to be nonretail in nature to make inapplicable generally the exemption of section 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2).

■ Substantiality has always been the general legal test applied for bringing the Fair Labor Standards Act into play, in its various aspects, to its fullest reach. See e. g. Walling v. Jacksonville Paper Co., 317 U.S. 564, 572, 63 S.Ct. 332, 337, 87 L.Ed. 460; Ralph Knight, Inc., v. Mantel, 8 Cir., 135 F.2d 514, 517; Southern California Freight Lines v. McKeown, 9 Cir., 148 F.2d 890, 891; Roberg v. Henry Phipps Estate, 2 Cir., 156 F.2d 958, 961; Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527, 530. As a matter of judicial definition, the term need not and will not be translated into any

absolute numerical percentage. It is sufficient for judicial purposes, if the amount is such, in the context in which it arises, that the court has no right to say, on the basis of all the considerations involved, that it legally can be ignored.

Appellant argues that the Administrator's interpretation in paragraph 18 of Interpretative Bulletin No. 6 is arbitrary and beyond his powers under the Act. That paragraph provides: "The foregoing discussion [in the Bulletin] indicates the principal attributes of a retail establishment for purposes of section 13(a) (2). Minor discrepancies, of course, will not defeat the exemption. Major variations from the pattern, however, do indicate that the exemption is inapplicable. Thus, for example, an establishment which makes some nonretail sales nevertheless would be considered a retail establishment if the gross receipts from nonretail sales are not substantial in relation to the total gross receipts of the establishment. For purposes of enforcement the Administrator will ordinarily consider the nonretail selling of an establishment to be substantial if the gross receipts from such selling constitute more than one-quarter (25 percent) of the total gross receipts of the establishment."

■ As to the reasonableness of using dollar volume, either administratively or judicially, in comparing the retail and nonretail operations of a business for purposes of section 13(a) (2), we can see no real question. Cf. Brown v. Minngas Co., D.C. Minn., 51 F.Supp. 363, 371. Certainly, cash volume has always been a primary yardstick in the commercial world. Whether an absolute percentage of 25 would be reasonable as the pivot for exemption or nonexemption under section 13(a) (2), there is no occasion for us to consider. In the present case, the percentages of nonretail business were, as we have said, 96.6 per cent for the one coal yard and, for the other, 44.6 per cent and 37.5 per cent. Even without the Administrator's standard in Interpretative Bulletin No. 6, these amounts are so substantial in the situation that it could not be declared as a matter of law that the trial court had no right to regard the pattern of appellant's operations as

being so affected by them as to defeat the exemption of its business generally under section 13(a) (2). And as to the Administrator's standard, it is proper to add that, as the Bulletin indicates, it is a test adopted simply "for purposes of [administrative] enforcement"; that it contains the qualification that it will be applied "ordinarily"; and that in legal significance it is only a practical "guide", Roberg v. Henry Phipps Estate, 2 Cir., 156 F.2d 958, 961, or a "working hypothesis", D. A. Schulte, Inc., v. Gangi, 328 U.S. 108, 117, footnote 16, 66 S.Ct. 925, 928, 90 L.Ed. 1114, 167 A.L.R. 208.

█ Appellant has renewed here its argument in the trial court that on the question of exemption the Administrator and the courts should accept the special concept of the coal industry that one who sells coal in less than carload lots is a retailer and one who sells in carload lots only is a wholesaler. To this contention the general definition in the Roland Electrical case implies a sufficient answer. Beyond this, it need only be pointed out that, if the Fair Labor Standards Act were not intended to have a general and uniform reach in coverage and exemption, it obviously would become a legal crazyquilt instead of a statute of general accomplishment. The fact, therefore, that Congress has accepted the coal industry's special concept of retailers and wholesalers for purposes of other statutes relating to that business, or that the concept has been promulgated into administrative definition under some of such statutes, cannot be said to compel the conclusion that the concept is controlling as to the Fair Labor Standards Act.[4] Cf. Walling v. Consumers Co., 7 Cir., 149 F.2d 626, 630, 631; West Kentucky Coal Co. v.

Walling, 6 Cir., 153 F.2d 582, 584, 585. See also generally Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616, 619; Sternberg Dredging Co. v. Walling, 8 Cir., 158 F.2d 678, 680, 681.

From what we have said, it follows that the trial court's finding and conclusion of nonexemption must be permitted to stand. Incidentally, all of the reported decisions to date involving similar coal yards have also denied the claim to exemption under section 13(a) (2). See West Kentucky Coal Co. v. Walling, 6 Cir., 153 F.2d 582; Barrick v. South Chicago Coal & Dock Co., 7 Cir., 149 F.2d 960; Walling v. Consumers Co., 7 Cir., 149 F.2d 626; Wood v. Central Sand & Gravel Co., D.C.W.D. Tenn., 33 F.Supp. 40; Pruett v. Carruthers & Son Lumber Co., Tenn.App. 5 Wage Hour Rep. 192.[5]

The only remaining question is on appellant's motion to remand the case to allow it to attempt to escape the injunction against it, under the provisions of section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258.

That section provides: "In any action or proceeding commenced prior to or on or after May 14, 1947 based on any act or omission prior to May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any admin-

---

[4] Some of the statutes and administrative regulations adopting the coal industry's special concept of retailer and wholesaler, on which appellant relies, are the Bituminous Coal Act of 1937, 50 Stat. 72, 81, 15 U.S.C.A. § 833(h); the Bituminous Coal Conservation Act of 1935, 49 Stat. 991; the Regulations of the Solid Fuels Administrator for War, 8 Fed.Reg. p. 15176, as amended by Order No. 27, dated March 14, 1945; Regulations of the National Bituminous Coal Commission, 2 Fed.Reg., Part 2, pp.

2557–2562, 2791–2797, 2873–2879; Rules of the Secretary of Labor under the Walsh-Healey Public Contracts Act, 49 Stat. 2036, 41 U.S.C.A. § 35 et seq., Wage and Hour Manual, 1944–1945, Part II, Administrative Regulations, Art. 101; the Code of Fair Competition for the Retail Solid Fuel Industry adopted under the National Industrial Recovery Act, 48 Stat. 195.

[5] Not designated by court for publication.

istrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

 The term "liability" as used in the section has reference, in our opinion, to the pecuniary liability provided for in section 16 of the Fair Labor Standards Act, 29 U.S.C.A. § 216. In this connection, it is perhaps not without significance that section 16 specifically uses the term "liability" in relation to the employer's obligation for minimum wages, overtime compensation and damages, and that the term is not used in section 17, 29 U.S.C.A. § 217, dealing with the issuance of injunctions. Again, the purpose of an injunction is not to render an employer subject to punishment for past violations of the Act but merely to compel his future obedience to it. We can find nothing in the Portal-to-Portal Act or in its legislative history to suggest that Congress intended in any way to affect the granting of an injunction against an employer when the court believed that there was a probability of recurrent violation of the Fair Labor Standards Act. No attempt has been made to argue here that the evidence does not furnish a sufficient basis for the injunction granted, if appellant is not subject to exemption as a "retail establishment" or if the court's right to issue an injunction is not affected by section 9 of the Portal-to-Portal Act. Of course, if there should be any attempt to cite appellant for contempt on the basis of some violation occurring between the date of the injunction and May 14, 1947, the controlling date under section 9 of the Portal-to-Portal Act, the court undoubtedly would consider the extent, if any, to which the violation should be punished in relationship to that section, but appellant is not entitled to have the injunction dissolved in anticipation simply of such a possible situation, if that should be its

fear here. And if appellant is within section 9 as to any claims of its employees, it will have an opportunity to use the section when an attempt is made to subject it to liability on such claims.

Beyond what has been said, it further may be called to mind that, as a matter of general knowledge, of legislative history in the enactment of the Portal-to-Portal Act, and of direct expression in section 1 of that Act, 29 U.S.C.A. § 251, there can be no doubt that the concern of Congress in the Portal-to-Portal Act was with the vast unforeseen accumulation of windfall wage, overtime and damage claims to which some of the decisions of the Supreme Court had given rise, with their possible threat to the solvency of numerous employers and to the stability of the industrial structure generally. It was this aspect against which Congress was attempting to afford protection.

Views similar to those here taken have been expressed in Western Union Tel. Co. v. McComb, 6 Cir., 165 F.2d 65, 73.

The motion of appellant to remand the case to the trial court is denied and the judgment is affirmed.